896 So.2d 886 (2005)
NORTH MIAMI MEDICAL CENTER, LTD., d/b/a Parkway Regional Medical Center, Appellant,
v.
Josie MILLER, Appellee.
Nos. 3D03-3183, 3D03-3233.
District Court of Appeal of Florida, Third District.
March 2, 2005.
*887 Parenti, Falk, Waas, Hernandez & Cortina, P.A., and Gail Leverett Parenti, Coral Gables, for appellant.
Podhurst Orseck, P.A., Joel S. Perwin, and Lisa S. Levine, for appellee.
Before LEVY, C.J., and SHEPHERD, J., and SCHWARTZ, Senior Judge.
SHEPHERD, J.
This is an appeal of a summary judgment granted Josie Miller under section 458.320 of the Florida Statutes (2002) against Parkway Regional Medical Center to recover the "minimal financial responsibility amount" of $250,000 on a $1.4 million medical malpractice judgment Miller had previously received against Dr. Mario Nanes, a neurosurgeon with staff privileges at Parkway. We are also presented with a cross-appeal by Miller on the grounds that $20,000 she received from Dr. Nanes towards the judgment should not have been deducted from the $250,000 allegedly owed by the hospital. We reverse the award of summary judgment against Parkway, and thereby moot the issue on cross-appeal.
In April 1999, Josie Miller received a cervical decompressive laminectomy, performed by Dr. Nanes at Parkway. Over the following year she developed quadriplegia, and subsequently brought suit which resulted in a jury verdict finding Dr. Nanes liable. In November 2002, Miller was awarded a judgment in the amount of $1,394,000.00, and a cost judgment of approximately $13,000.00.
Dr. Nanes filed for bankruptcy, but gave Miller $20,000 towards the medical malpractice judgment. Miller then made a demand on Parkway to pay $250,000 of the outstanding judgment under section 458.320. Miller asserted that section 458.320 of the Florida Statutes required the hospital to tender the first $250,000 to meet Dr. Nanes' minimum financial responsibility requirement for enjoying staff privileges at any hospital, in the event Dr. Nanes subsequently failed to pay any judgments for his negligent acts.
Under that section, physicians, as a condition of receiving staff privileges at a hospital, are required to demonstrate financial responsibility through one of many elective choices. Section 458.320(2)(b)[1] allows staff privileges to be conditioned upon *888 either a showing of professional liability insurance coverage, an escrow account, or an irrevocable letter of credit. Alternatively, a physician can "opt out" of the requirements of subsection (2)(b) through section 458.320(5)(g),[2] whereby the physician agrees to be personally responsible for the payment of the first $250,000 of a judgment, or be subject to discipline by the Department of Health.[3] Dr. Nanes had made a subsection 5(g) election for which he had tendered a sworn statement of financial responsibility to Parkway in October 1997.[4]
*889 Based on Dr. Nanes statutory election to be "personally" liable to satisfy any judgments up to $250,000, Parkway refused Miller's demand. In response, Miller instituted an action against Parkway alleging that the hospital was strictly liable to pay the first $250,000 of the judgment since Dr. Nanes did not. On cross-motions for summary judgment, the lower court granted Miller's motion, finding that the hospital was liable for satisfying the first $250,000 of the judgment against Dr. Nanes; however, a final summary judgment in the amount of $230,000 was entered against Parkway by adjusting the $20,000 that Dr. Nanes had already paid towards the judgment. This appeal and cross-appeal follows.
At the outset, we note that there is a developing controversy in the courts of appeal of this state concerning whether or not a cause of action exists against a hospital under section 458.320 of the Florida Statutes for the failure of their staff-privileged physicians to comply with the statute. Common law principles have historically prohibited a cause of action against a hospital for the negligent employment of a "financially `incompetent' physician." See Beam v. University Hosp. Bldg., Inc., 486 So.2d 672, 673 (Fla. 1st DCA 1986) ("[n]o concurrent public reliance on a hospital's monitoring of a staff physician's malpractice judgment-paying skills has been noted"); compare Garcia v. Duffy, 492 So.2d 435 (Fla. 2d DCA 1986) (Florida law does recognize a cause of action for negligent hiring and negligent retention).
A statutory cause of action under section 458.320 of the Florida Statutes was first recognized without much discussion in the case of Robert v. Paschall, 767 So.2d 1227 (Fla. 5th DCA 2000), and thereafter summarily followed in Baker v. Tenet Healthsystem Hospitals, Inc., 780 So.2d 170 (Fla. 2d DCA 2001). More recently, this court followed suit in Mercy Hospital, Inc. v. Baumgardner, 870 So.2d 130 (Fla. 3d DCA 2003), holding that a hospital is strictly liable if it grants staff privileges to a doctor who has not complied with section 458.320(2)(b). However, this position is not without disagreement. See Mercy Hosp., 870 So.2d at 132 (Green, J. dissenting); see also Plantation General Hosp. Ltd. P'ship v. Horowitz, 895 So.2d 484 (Fla. 4th DCA 2005) (majority opinion) (holding that a hospital is not strictly liable for the misdeeds of its staff physicians under section 458.320 and certifying conflict with Mercy Hospital) and (Farmer, J. concurring) (arguing that no cause of action exists against the hospital under any circumstances).
Fortunately for us, the question of whether the Legislature intended a cause of action against the hospital in this case is not before us, nor relevant for today's decision. We must simply decide whether a staff-privileged physician's statutory election under subsection 5(g) would absolve any liability of a hospital. We hold that a hospital is entitled to rely on a staff-privileged physician's exercise of a statutory right under subsection 5(g) to be "personally liable" for any judgments up to $250,000.
While it may appear that we are disagreeing with the other districts and even intra-district, the conflict is not panoptic. Our holding in this case is based solely on the unique facts presented here. The Baker and Mercy Hospital decisions involved physicians who had made a subsection 2(b) election to provide their respective hospitals with evidence of insurance, an escrow account or a letter of credit *890 prior to receiving staff privileges. Although the Robert decision involved a physician who is alleged to have "gone bare" (i.e. "without insurance"), that court, however, never adjudicated whether "going bare" or "opting out" through subsection 5(g) is expressly authorized and therefore, serves as a defense to immunize the hospital. Robert, 767 So.2d at 1228. We find that these prior cases are inapplicable to case sub judice, since Dr. Nanes made an election under subsection (5)(g) which specifically authorizes physicians to opt out of (2)(b) by personally agreeing to be liable or face discipline, and also because here, Parkway has specifically asserted same as a defense.
If we were to agree with the lower court, then we would necessarily be holding that section 458.320 of the Florida Statutes was a strict liability statute to which there is no defense.[5] We are not free to ascribe such a presumptuous legislative intent, especially since the chief purpose of both the 1985 and 1986 tort reform and insurance legislation was to expand the availability of health care in high risk areas by allowing physicians the flexibility to choose among different alternatives of financial responsibility. See infra fn.4. Therefore, we decline the invitation to judicially engraft a rule of such "super-strict" liability into section 458.320, see Association for Retarded Citizens  Volusia, Inc. v. Fletcher, 741 So.2d 520, 525 (Fla. 5th DCA 1999) ("[h]ad it been the intent of the legislature to abrogate the well-settled common law rule ... the legislature would no doubt have said so"), and we do not read Mercy Hospital as requiring it. Mercy Hosp., 870 So.2d at 134 (Green, J. dissenting) ("[w]e cannot assume that the legislature intended to create a cause of action and abrogate the common law without clear, unambiguous and affirmative language to that effect"); see also Plantation General, slip op. at ___ ("[t]he legislative intent that a statutory-based private cause of action should proceed as a strict liability claim must be clearly and plainly expressed").
In short, it is not that Dr. Nanes has been "noncompliant" with a condition for receiving staff privileges, but more that he has been perfectly compliant by choosing his statutorily authorized right to be "personally" liable for a judgment up to $250,000. Therefore, it follows that the statute must necessarily relieve hospitals of any liability if its physicians who, though initially agreeing to be personally liable, are ultimately unable to pay any subsequent judgments. The statute requires hospitals to assure compliance at the granting or renewal of staff privileges; it does not require hospitals to insure or guarantee the outcome in the event a subsection 5(g) physician subsequently does not compensate his injured patient. This is necessarily so because the statutory consequence contemplated for subsection 5(g) noncompliance is discipline of the physician by the Department of Health. Murthy v. N. Sinha Corp., 644 So.2d 983, 987 *891 (Fla.1994) (where a statute recognizes a "sanction ... for violation, [it does] not imply ... a private right of action"). Accordingly, the statute should not be interpreted to imply a private cause of action against the hospital as a guarantor of financial responsibility of its staff-privileged physicians when the physician decides to "go bare" or "opt out" of subsection 2(b) and agrees to be personally liable under subsection 5(g). Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) (judicial implication of a private cause of action must be "consistent with" the legislative scheme). As such, the lower court erred in granting summary judgment against Parkway after Dr. Nanes had made an authorized election under subsection 5(g).
Reversed.
NOTES
[1] Section 458.320(2)(b) provides:

(2) Physicians who perform surgery in an ambulatory surgical center... and, as a continuing condition of hospital staff privileges,... must also establish financial responsibility by one of the following methods:
(a) Establishing and maintaining an escrow amount consisting of cash or assets eligible for deposit....
(b) Obtaining or maintaining professional liability coverage in an amount not less than $250,000 per claim, with a minimum annual aggregate of not less than $750,000 from an authorized insurer....
(c) Obtaining and maintaining an unexpired irrevocable letter of credit ... in an amount not less than $250,000 per claim, with a minimum aggregate availability of credit of not less than $750,000....
[2] Specifically, section 458.320(5)(g) provides, in pertinent part:

(5) The requirements of subsections (1), (2), and (3) shall not apply to:
* * *
(g) Any person holding an active license under this chapter who agrees to meet all of the following criteria:
(1) Upon the entry of an adverse final judgment arising from a medical malpractice arbitration award, from a claim of medical malpractice either in contract or tort, or from noncompliance with the terms of a settlement agreement arising from a claim of medical malpractice either in contract or tort, the licensee shall pay the judgment creditor the lesser of the entire amount of the judgment with all accrued interest or ... $250,000, if the physician is licensed pursuant to this Chapter and maintains hospital staff privileges, within 60 days after the date of such judgment became final and subject to execution, unless otherwise mutually agreed to in writing by the parties.
* * *
(2) The Department of Health shall issue an emergency order suspending the license of any licensee who, after 30 days following receipt of a notice from the Department of Health, has failed to: satisfy a medical malpractice claim against him or her....
[3] As part and parcel of making a 5(g) election, a physician who elects to "go bare," as the election is sometimes described, must also provide notice to his patients through a posting in his office or via another prescribed method. This way, a patient uncomfortable with a "bare" physician can elect not to engage his services. See § 458.320(5)(g), Fla. Stat.
[4] While it may appear that the subsection 5(g) option "swallows the "2(b)" rule," the 5(g) exemption was borne out of a concern that "spiraling insurance rates" "pose[d] a dire threat to the continuing availability of health care in our state." See Comprehensive Medical Malpractice Reform Act of 1985, Ch. 85-175, Laws of Florida, at 1183. Specifically, the Legislature noted that prohibitive medical malpractice insurance costs for high risk physicians such as "obstetricians, cardiovascular surgeons, neurosurgeons [like Dr. Nanes], orthopedic physicians and anesthesiologists ... threatened the quality of health care services in Florida as physicians become increasingly wary of high-risk procedures and are forced to downgrade their specialties to obtain relief from oppressive insurance rates." Id. at 1182-1183. The 1985 Act thus spawned section 458.320(2)(b), which statutorily specified the degree of financial responsibility required to be exhibited by hospital staff-privileged physicians and, in 1986, the Legislature followed up by adopting a substantial number of amendments to the 1985 Act, including the subsection 5(g) exemption, in a further effort to balance the need for financial responsibility with the equally important need for the availability of medical services. See Tort Reform and Insurance Act of 1986, Ch. 86-160, Laws of Florida; see also Smith v. Department of Ins., 507 So.2d 1080, 1086 (Fla.1987). In Smith, the Florida Supreme Court, in the face of a constitutional challenge to the 1986 Act, agreed with the Legislature that "physicians were severely limiting their practice in certain areas of medicine ... resulting from the unavailability or increased cost of liability insurance." Smith, 507 So.2d at 1086. The court concluded that because the legislature had a "rational basis" for adopting [Ch. 86-160 to treat the liability insurance crisis], it was "within constitutional parameters," and that it was "not for th[e] Court to determine ... [w]hether this [was] the best solution." Id. at 1095. For a substantial history of the amending act, Ch. 86-160, Laws of Florida, including an extensive report, see Florida Senate Commerce Committee, A Review of Historical Analysis  Current Perspectives of Joint and Several Liability and a Review of Tort Reform (1986).
[5] In any other legal realm, defenses are available to strict liability causes of action at common law. See Kidron, Inc. v. Carmona, 665 So.2d 289, 291 (Fla. 3d DCA 1995) ("comparative negligence [is] a defense in strict liability actions if based upon grounds other than [the] failure of the user to discover the defect in the product or ... to guard against the possibility of its existence"), citing West v. Caterpillar Tractor Co., 336 So.2d 80, 91 (Fla.1976), disapproved on other grounds, D'Amario v. Ford Motor Co., 806 So.2d 424, 442 (Fla.2001) (principles of comparative fault concerning apportionment of fault as to the cause of the underlying crash will not ordinarily apply in crashworthiness or enhanced injury cases, but comparative fault may be asserted as a defense in a strict liability claim for crashworthiness where there is a valid issue as to whether Plaintiff's negligence contributed to the cause of the enhanced injuries, as opposed to the initial crash).