959 So.2d 176 (2007)
Stuart HOROWITZ, etc., et al., Petitioners,
v.
PLANTATION GENERAL HOSPITAL LIMITED PARTNERSHIP, etc., Respondent.
No. SC05-331.
Supreme Court of Florida.
May 24, 2007.
*177 H. Mark Purdy and Rose-Ann Flynn of Purdy and Flynn, P.A., Fort Lauderdale, FL, for Petitioners.
Arthur J. England, Jr. and Edward G. Guedes of Greenberg Traurig, P.A., Miami, FL, Hal B. Anderson and Kevin M. Vannatta of Billing, Cochran, Heath, Lyles, Mauro and Anderson, Fort Lauderdale, FL, for Respondents.
Joel S. Perwin of Joel S. Perwin, P.A., Miami, FL, on behalf of the Academy of Florida Trial Lawyers; and Gail Leverett Parenti of Parenti and Parenti, PA., Miami, FL, and William A. Bell, General Counsel, Florida Hospital Association, Tallahassee, FL, on behalf of the Florida Hospital Association, as Amicus Curiae.
PARIENTE, J.
In this case, a patient with an unsatisfied money judgment against a physician for medical malpractice seeks recovery from a hospital where the physician had staff privileges, alleging that the hospital should be liable to her for failing to ensure that the physician complied with statutory financial responsibility requirements. The issue is whether section 458.320, Florida Statutes (2006), which outlines the financial responsibility requirements for physicians practicing in Florida, imposes civil liability on the hospital under these circumstances. See Plantation Gen. Hosp. Ltd. P'ship v. Horowitz, 895 So.2d 484 (Fla. 4th DCA 2005).
The Fourth District Court of Appeal held that there was no indication of legislative intent to impose civil liability on hospitals anywhere in the statutory scheme. See id. at 488. This decision expressly and *178 directly conflicts with Robert v. Paschall, 767 So.2d 1227 (Fla. 5th DCA 2000), Baker v. Tenet Healthsystem Hospitals, Inc., 780 So.2d 170 (Fla. 2d DCA 2001), and Mercy Hospital, Inc. v. Baumgardner, 870 So.2d 130 (Fla. 3d DCA 2003), all of which recognized a statutory cause of action based on section 458.320. We accepted jurisdiction to resolve this conflict. See art. V, § 3(b)(3), Fla. Const.
We conclude, based on a review of the applicable statutory provisions, that the Legislature did not intend to impose civil liability on hospitals for failing to ensure that physicians who are granted staff privileges comply with the financial responsibility requirements of section 458.320. We therefore approve the Fourth District's decision in this case and disapprove the decisions in Robert, Baker, and Baumgardner.

FACTS AND PROCEDURAL HISTORY
In January 1996, Lena Horowitz visited the office of Derek V. Jhagroo, M.D., for examination and treatment of her infected right thumb. On January 22, 1996, Dr. Jhagroo admitted her to Plantation General Hospital ("Plantation"), where it became necessary to amputate her thumb. Lena Horowitz and her husband, Max Horowitz, filed a malpractice suit against Dr. Jhagroo, alleging that he committed malpractice while examining and treating her right thumb in his office. The complaint alleged that Dr. Jhagroo was negligent in the treatment he provided in his office and did not involve any allegations arising from the admission and surgery conducted at Plantation. Dr. Jhagroo was the only defendant and there was no allegation that Dr. Jhagroo was an employee of the hospital.
The malpractice action resulted in a verdict in the Horowitzes' favor and a final judgment against Dr. Jhagroo in the amount of $859,200.73. However, the judgment was uncollectible because Dr. Jhagroo failed to maintain malpractice insurance or otherwise comply with the financial responsibility requirements of section 458.320, owned no real property in the United States, and resided in another country.
In February 2001, after unsuccessfully attempting to collect the judgment from Dr. Jhagroo, the Horowitzes filed suit against Plantation.[1] The amended complaint alleged that Plantation breached a statutory duty under section 458.320(2) in failing to ensure the financial responsibility of Dr. Jhagroo as a physician who had been granted staff privileges at the hospital.[2] Specifically, Horowitz asserted that *179 because of that failure, Plantation was liable for the first $250,000 of the unsatisfied judgment. Horowitz and Plantation each filed motions for summary judgment. The issue on summary judgment was whether the holdings of the Second, Third, and Fifth Districts would apply to a case in which the underlying malpractice occurred in the physician's office rather than the hospital. See Horowitz, 895 So.2d at 485.[3]
In Robert, one of the conflict cases, the Fifth District determined that section 458.320(2) mandates financial responsibility as a condition to maintaining staff privileges and therefore imposes a duty on the hospital to ensure physician compliance. 767 So.2d at 1228. The Fifth District reasoned that the "obvious intent of the legislature was to make sure that a person injured by the medical malpractice of a doctor with staff privileges would be able to ultimately recover at least $250,000 of compensable damages." Id. The court then held that the cause of action against the hospital would accrue only after the injured person obtained a judgment against the physician for medical malpractice, and that the hospital's liability would be limited to $250,000. Id. at 1228-29. The Second District in Baker, 780 So.2d at 171-72, and the Third District in Baumgardner, 870 So.2d at 131-32, agreed with the Fifth District's opinion in Robert.
The trial court, relying on the decisions of these district courts of appeal, granted summary judgment in favor of Horowitz and awarded him $250,254. This amount represented the minimum level of financial responsibility required by the statute, $250,000, plus taxable costs.
On appeal, the Fourth District reversed the judgment of the trial court without drawing a distinction between malpractice that occurs in a hospital and malpractice that occurs in a physician's office. The Fourth District rejected the assertion that section 458.320 creates a statutory cause of action against a hospital "whether it be based on strict liability, negligence, suretyship, contract, contribution, indemnification, criminal punishment, or any other legal theory the creative minds of lawyers can discern." Horowitz, 895 So.2d at 488. The Fourth District determined that the intent of the statute was to ensure that physicians maintain financial responsibility to satisfy judgments against them and not to make hospitals liable for the unsatisfied malpractice judgments of their staff-privileged physicians. Id. at 487. The court noted that its decision conflicted with Robert, Baker and Baumgardner. Id. at 488.

ANALYSIS
Our determination of whether section 458.320 imposes civil liability on hospitals is a question of statutory interpretation. Therefore, our review is de novo. See Aramark Unif. & Career Apparel, Inc. v. Easton, 894 So.2d 20, 23 (Fla.2004). We first address whether hospitals have a duty under the common law to ensure the financial responsibility of staff-privileged physicians. The analysis of the common law provides a basis upon which to determine whether the statute codifies, modifies, or supplants legal principles that previously existed. See id. Then, we discuss how this Court determines whether a statute imposes civil liability when the Legislature has not expressly provided for a private remedy. Finally, with this framework in mind, we examine the primary purpose of chapter 458, the language of section 458.320, other provisions in chapter 458, and related provisions in other chapters to determine legislative intent.

*180 A. Common Law
At common law, a hospital was not vicariously liable for the tortious acts of an independent contractor such as a physician in private practice to whom it had granted staff privileges. See Insinga v. LaBella, 543 So.2d 209, 212-13 (Fla.1989). However, consistent with decisions in a number of other jurisdictions, this Court recognized a common law duty on the part of Florida hospitals to exercise reasonable care in granting staff privileges to physicians. See id. at 213-14. We held that when a hospital breaches that duty by granting staff privileges to a medically incompetent physician, the hospital is liable based on a theory of negligence. See id. In Insinga, we referred to this theory of liability as the "corporate negligence doctrine," whereby the "hospital's liability is founded on the independent duty it owes to its patients" to "be responsible for proper medical treatment on its premises." Id. at 214. Accordingly, we stated:
While the term "corporate negligence" may have a much broader connotation, we construe it here to mean that a hospital's liability is founded on the independent duty it owes to its patients. The public policy which justifies placing the expanded responsibility and duty of care on a hospital is based on the present day view that a hospital is a multifaceted health care facility that should be responsible for proper medical treatment on its premises. This view is justified because the hospital is in a superior position to supervise and monitor physician performance and is, consequently, the only entity that can realistically provide quality control.
. . . [W]e find, as a matter of public policy, that hospitals are in the best position to protect their patients and, consequently, have an independent duty to select and retain competent independent physicians seeking staff privileges. We note that the hospital's liability extends only to the physician's conduct while rendering treatment to patients in the hospital and does not extend to his conduct beyond the hospital premises. Moreover, the hospital will only be responsible for the negligence of an independent physician when it has failed to exercise due care in the selection and retention of that physician on its staff.
Id. at 214 (citations omitted).
The common law duty recognized in Insinga was limited to the selection and retention of medically competent physicians for actions occurring in the hospital. We have never recognized a common law duty on the part of a hospital to ensure the financial responsibility of its staff-privileged physicians, who are independent contractors.
In Beam v. University Hospital Building, Inc., 486 So.2d 672, 673 (Fla. 1st DCA 1986), the First District rejected the argument that a hospital had a duty at common law to ensure the financial responsibility of its staff-privileged physicians.[4] As explained by the First District:
It is true that the corporate negligence doctrine is premised on the notion that it is foreseeable that a hospital's failure to properly investigate an applicant for staff privileges would present a foreseeable risk of harm to the hospital's patients. However, there is nothing in the case law on corporate negligence suggesting that this foreseeability of harm extends to conceivable risks of financial harm a patient might suffer should he *181 sue a physician financially incapable of paying a malpractice judgment.

Id. at 673 (citations omitted) (emphasis supplied).[5] The court affirmed the dismissal of the plaintiff's common law negligence action and noted "that no case, either in Florida or elsewhere, has recognized the tort of negligent selection of a financially `incompetent' physician." Beam, 486 So.2d at 673. Although the Fifth District in Robert recognized a statutory duty under section 458.320(2), the court declined to equate a duty to ensure physician compliance with the statutory financial responsibility requirements with a duty to ensure a physician's professional competence, namely, the common law duty of hospitals to select and retain professionally competent staff physicians. See 767 So.2d at 1228.
We agree with Beam and Robert that there is no recognized common law duty on the part of hospitals to monitor the financial responsibility of physicians and thus no common law cause of action against hospitals for breaching that duty. If such a duty and cause of action exist, they do so by virtue of statutory modification of the common law. Cf. Aramark, 894 So.2d at 23 ("A statute creates a new cause of action if it provides a remedy unavailable under the common law.").

B. Statutory Causes of Action
The seminal Florida case on whether a statutory cause of action exists without an express provision imposing civil liability is this Court's decision in Murthy v. N. Sinha Corp., 644 So.2d 983 (Fla.1994). In Murthy, the issue was whether chapter 489, Florida Statutes (1991), the licensing and regulatory chapter governing construction contracts, created a statutory cause of action against an agent who failed to supervise a corporation's construction project. See id. at 984. Because the relevant statute did not expressly provide for a civil cause of action, the question was whether one should be judicially implied. See id. at 985.
The Court explained that historically, when determining whether to judicially imply a cause of action, the primary focus was on whether the statute "imposed a duty to benefit a class of individuals" and that a "cause of action arose when a class member was injured by a breach of that duty." Id. However, we concluded that legislative intent had become the primary factor that most courts, including the United States Supreme Court, used to determine whether a cause of action exists when a statute does not expressly provide for one. See id. (citing Transamerica Mortgage Advisors, Inc. (TAMA) v. Lewis, 444 U.S. 11, 15-16, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), and Freehauf v. Sch. Bd. of Seminole County, 623 So.2d 761, 763 (Fla. 5th DCA 1993)).
In determining whether the Legislature intended to provide a private cause of action against a qualifying agent in chapter 489, we first recognized that the applicable statutes had imposed a duty on agents to supervise a corporation's construction projects. However, we explained that the recognition of a duty did not answer the question of whether a breach of that duty would give rise to civil liability. Id. at *182 985-86. To determine the existence of civil liability, we turned to the stated scope of chapter 489, which established licensing procedures and regulatory duties for the construction industry and created a licensing board to enforce the procedures and duties. See id. at 986. We concluded that there was "no evidence in the language of the statute or the statutory structure that a private cause of action against a qualifying agent was contemplated by the legislature in enacting this statute." Id. Rather, the "language of chapter 489 indicates that it was created merely to secure the safety and welfare of the public by regulating the construction industry." Id.
Importantly, we noted that "[i]n general, a statute that does not purport to establish civil liability but merely makes provision to secure the safety or welfare of the public as an entity, will not be construed as establishing a civil liability." Id. Further, we looked to prior statutory enactments and explained that the "sole provision . . . authorizing private suits" had authorized them only against unlicensed or uncertified contractors and that even that provision had been removed. Id. Without evidence of legislative intent in the "language or the legislative history" of chapter 489, we declined to recognize a private remedy against a qualifying agent. Id.
Since Murthy, we have reaffirmed the principle that whether a statutory cause of action should be judicially implied is a question of legislative intent. See Aramark, 894 So.2d at 23; Villazon v. Prudential Health Care Plan, Inc., 843 So.2d 842, 852 (Fla.2003). We agree with the Fourth District that legislative intent, as used in Murthy and its progeny, is a "shorthand reference to the ordinary tools for discerning statutory meaning: text, context, and purpose." Horowitz, 895 So.2d at 486. Moreover, we agree with the overarching principle that judges lack the power "to construe an unambiguous statute in a way which would extend, modify, or limit, its express terms or its reasonable and obvious implications. To do so would be an abrogation of legislative power." Holly v. Auld, 450 So.2d 217, 219 (Fla.1984).
The primary guide to our analysis of whether the Legislature intended to impose civil liability is, as in all cases of statutory construction, the "actual language used in the statute." Borden v. East-European Ins. Co., 921 So.2d 587, 595 (Fla.2006). In determining the meaning of the language used, we look not only to the words themselves but also to "the context in which the language lies." Miele v. Prudential-Bache Sec., Inc., 656 So.2d 470, 472 (Fla.1995).

C. Chapter 458, Florida Statutes
Horowitz relies on section 458.320, entitled "Financial Responsibility," to assert that the Legislature intended to impose a duty on, and create a cause of action against, the hospital.[6] Chapter 458, in which this provision is located, primarily regulates the practice of physicians and medical practitioners, not hospitals. This is evident not only from the substance of the chapter but from the title itself "Medical Practice." Cf. City of Boca Raton v. State, 595 So.2d 25, 29 n. 3 (Fla. 1992) (stating that the title of a chapter reflects the Legislature's intent). In this chapter, the Legislature established procedures *183 and requirements relating to practitioner licensing, specialized certification, physician financial responsibility, discipline, and physician supervision over assistants and created the Board of Medicine. Furthermore, the regulations in chapter 458 are intended to safeguard the public from unsafe and unqualified physicians. See § 458.301, Fla. Stat. (2006). This is evidenced by the Legislature's statement "that physicians who fall below minimum competency or who otherwise present a danger to the public shall be prohibited from practicing in this state." Id. With this overview in mind, we turn to the pertinent provisions of chapter 458.
Section 458.320 sets forth the statutory financial responsibility requirements for physicians practicing in Florida. The first subsection of this provision applies to all physicians and requires, as a condition of licensure, that physicians demonstrate a financial ability to pay medical malpractice claims. See § 458.320(1), Fla. Stat. (2006). Specifically, section 458.320(1) provides:
As a condition of licensing and maintaining an active license, and prior to the issuance or renewal of an active license or reactivation of an inactive license for the practice of medicine, an applicant must by one of the following methods demonstrate to the satisfaction of the board and the [D]epartment [of Health[7]] financial responsibility to pay claims and costs ancillary thereto arising out of the rendering of, or the failure to render, medical care or services. . . .
The physician's alternative options for compliance are: (a) establishing and maintaining an escrow account in the per claim amounts specified in paragraph (b); (b) maintaining professional liability coverage in an amount not less than $100,000 per claim and $300,000 in total; or (c) obtaining and maintaining an unexpired, irrevocable letter of credit in an amount not less than $100,000 per claim and $300,000 in total. § 458.320(1)(a)-(c), Fla. Stat.
Subsection (2) of section 458.320 applies only to physicians who perform ambulatory surgery and physicians who are granted staff privileges at a hospital. This subsection provides that "[p]hysicians who perform surgery in an ambulatory surgical center licensed under chapter 395 and, as a continuing condition of hospital staff privileges, physicians who have staff privileges must also establish financial responsibility." § 458.320(2), Fla. Stat. (emphasis supplied).[8] The methods for establishing financial responsibility in subsection (2) parallel those in subsection (1) except that the minimum amount per claim is $250,000 rather than $100,000.
Based on the single statement in subsection (2) requiring physicians with staff privileges to establish financial responsibility "as a continuing condition of hospital staff privileges," Horowitz asserts that the Legislature intended to both impose a statutory duty on hospitals to monitor compliance and create a statutory cause of action against hospitals for a breach of this duty. However, we conclude that there is no indication in this single statement of legislative intent to impose civil liability on hospitals. This determination is reinforced by reading this statutory provision in conjunction with other subsections of section 458.320, and within the greater context of chapter 458 and related statutory provisions discussing hospital responsibilities. Examination of these other provisions *184 is appropriate because, as we have previously stated, "[i]t is axiomatic that all parts of a statute must be read together in order to achieve a consistent whole." Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So.2d 452, 455 (Fla.1992).
Although section 458.320(2) requires staff-privileged physicians to comply with the statutory financial responsibility requirements, section 458.320(5)(g) authorizes physicians to "opt out" of these requirements. Section 458.320(5)(g) states that any licensed practitioner who, among other things, agrees to "pay the judgment creditor . . . $250,000, if the physician is licensed pursuant to this chapter and maintains hospital staff privileges, within 60 days after the date such judgment [becomes] final," is exempt from the financial responsibility requirements of section 458.320(2). Thus, this provision allows a physician to maintain hospital staff privileges without having to establish financial responsibility as required by section 458.320(2). See id.
Under section 458.320(5)(g), a physician could be in compliance with the provision when he or she receives staff privileges by agreeing to be personally liable for malpractice judgments in the future, but nevertheless be unable to satisfy the judgment when it becomes due. Accordingly, even if the hospital confirms that the physician is in compliance with the "opt out" provision when the physician receives staff privileges, the hospital cannot ensure that the physician will be able to satisfy the malpractice judgment once it is entered. Additionally, if the physician fails to pay the first $250,000 of the judgment and therefore falls out of compliance with section 458.320(5)(g), he or she is only subject to discipline by the Department of Health. Clearly, the Legislature could not have intended to require the hospital to guarantee the future financial responsibility of a physician who makes an election under section 458.320(5)(g).[9] Given this logical interpretation of the "opt-out" provision in section 458.320(5)(g), it would be inconsistent to read section 458.320(2) as requiring a hospital to ensure or guarantee payment of the first $250,000 of a malpractice judgment against a physician.
Beyond the alternative methods for establishing financial responsibility, the statutory enforcement mechanisms for noncompliance indicate that the Legislature did not intend to hold a hospital liable for a physician's failure to comply with the requirements of section 458.320. Section 458.320(3)(a) provides that the physician must meet the "financial responsibility requirements of this section . . . at the time of issuance or renewal of a license." Under this provision, it is the physician's responsibility to comply with the requirements of section 458.320. A physician who violates the financial responsibility requirements in section 458.320 is subject to significant administrative penalties, including the possible revocation of his or her license and other discipline. See § 458.331(1)(nn), Fla. Stat. (2006) (stating that "[violating] any provision of this chapter" is grounds for revocation of a license or discipline). The prospect of such administrative penalties provides a strong incentive to ensure physician compliance.
Further, pursuant to section 458.320(4)(a), it is the obligation of each insurer, self-insurer, risk retention group or joint underwriting association to "promptly notify the [D]epartment [of *185 Health] of cancellation or non-renewal of insurance." Unless the physician "demonstrates that he or she is otherwise in compliance with the requirements of this section, the department shall suspend the license of the physician" and "notify all health care facilities" of such action. Id. In contrast to the notification obligations that are placed on the insurer and the department, no statutory duty is placed on the hospital to notify the department of a staff-privileged physician's noncompliance with the financial responsibility requirements.
Moreover, the one provision in chapter 458 that affirmatively imposes duties on hospitals does not address physician financial responsibility. See § 458.337, Fla. Stat. (2006). Rather, the provision states that "the department shall be notified when any physician . . . [h]as been disciplined by a licensed hospital," § 458.337(1)(a)(2), Fla. Stat., and that "[a]ny organization taking action as set forth in this section shall report that action to the department." § 458.337(2), Fla. Stat. We conclude that the failure to impose additional duties on hospitals in chapter 458, such as notifying the department when one of its staff-privileged physicians is out of compliance with the statutory financial responsibility requirements, further indicates that the Legislature did not intend to impose civil liability on hospitals in section 458.320.
Lastly, in contrast to the language used in 458.320(2), two provisions in chapter 458 expressly impose civil liability. Section 458.3475(11), Florida Statutes (2006), makes an anesthesiologist liable for any act or omission of an anesthesiologist assistant under the anesthesiologist's supervision. Section 458.3295(3), Florida Statutes (2006), specifically holds a physician liable for damages that the hospital or patient sustains from the physician's concerted effort not to treat a patient in an emergency room. The fact that both of these provisions impose physician liability in clear and express terms provides additional support for the conclusion that the Legislature did not intend to impose civil liability on hospitals in section 458.320. Our reasoning is similar to that in Murthy, where we noted that the sole provision in the chapter that imposed civil liability applied only to unlicensed or uncertified contractors, indicating a lack of legislative intent to create a private remedy against a qualifying agent. See Murthy, 644 So.2d at 986; see also Cason v. Fla. Dep't of Mgmt. Services, 944 So.2d 306, 315 (Fla. 2006) (concluding that when the Legislature includes a requirement in one provision and excludes a similar requirement in a related provision, it intends a distinction because the Legislature "`knows how to' accomplish what it has omitted" in a particular statute) (quoting Rollins v. Pizzarelli, 761 So.2d 294, 298 (Fla.2000)).
Our analysis of chapter 458, specifically the text, context, and purpose of the relevant provisions, leads us to conclude that the Legislature did not intend to impose a duty on, or create a cause of action against, hospitals in section 458.320. An examination of related provisions in chapters 395 and 766, Florida Statutes, further supports this conclusion.

D. Chapters 395 and 766, Florida Statutes
Just as chapter 458 regulates medical practice, chapter 395, titled "Hospital Licensing and Registration," regulates hospital practice. Significantly, there is nothing in the provisions of chapter 395 that regulate hospital staff privileges that addresses physician compliance with the financial responsibility requirements of section 458.320. First, section 395.0191, Florida Statutes (2006), which outlines the rules pertaining to hospital staff privileges, *186 does not require the hospital to ensure physician compliance with section 458.320.[10] Second, sections 395.0193(2)(4), Florida Statutes (2006), which outline the hospital's duties in denying, suspending, or revoking staff privileges, do not require the hospital to take action when a physician fails to maintain financial responsibility. See § 395.0193(2)-(4), Fla. Stat. (requiring hospitals and their boards to review, and if necessary, take action in situations where staff-privileged physicians are incompetent, using drugs, have mental impairments, are found liable for medical negligence, or fail to abide by hospital policies).[11] If the Legislature intended to impose an affirmative duty on a hospital to "condition" the grant of staff privileges on a physician's establishing financial responsibility, it would have included this requirement in the sections governing a hospital's grant of staff privileges.
Like section 458.320, section 766.110, Florida Statutes (2006), was enacted as part of the Comprehensive Medical Malpractice Reform Act of 1985. See ch. 85-175, §§ 23, 28, Laws of Fla.[12] Section 766.110(1) provides that all health care facilities have "a duty to assure comprehensive risk management and the competence of their medical staff and personnel through careful selection and review, and are liable for a failure to exercise due care in fulfilling these duties." Conspicuously absent from section 766.110 is any mention of civil liability for a hospital's failure to ensure the financial competence of its staff-privileged physicians.
The fact that section 766.110 expressly imposes a duty on and creates a cause of action against hospitals for a breach of that duty provides a strong indication that the Legislature did not intend to impose civil liability on hospitals in section 458.320. Cf. Golf Channel v. Jenkins, 752 So.2d 561, 564 (Fla.2000) (indicating that when sections are enacted as part of the same session law they "should be construed together so that they illuminate each other and are harmonized") (internal quotation marks omitted). Had the Legislature intended to hold hospitals liable for failing to ensure physician financial responsibility, it would have either included such a duty and cause of action within section 766.110 or used parallel language to impose civil liability in section 458.320. See Cason, 944 So.2d at 315; Murthy, 644 So.2d at 986.

CONCLUSION
Although it may be sound public policy for the Legislature to impose an obligation on hospitals to monitor the financial responsibility of physicians who are granted staff privileges, it is outside this Court's purview to imply a statutory cause of action against hospitals where none was intended by the Legislature. Given the text of the provision, the stated intent, purpose, and general regulatory scheme of chapter 458, the applicable penalties, and the comparison to other provisions in the same *187 statutory scheme that clearly impose civil liability, we hold that section 458.320 neither imposes a duty on nor creates a cause of action against hospitals for failing to ensure the financial responsibility of their staff-privileged physicians. Therefore, we approve the Fourth District's decision in this case and disapprove the Fifth District's decision in Robert, the Second District's decision in Baker, and the Third District's decision in Baumgardner.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] After the amended complaint was filed, the parties stipulated to dismissal with prejudice as to Max Horowitz. Subsequently, in October 2001, Lena Horowitz passed away and Stuart Horowitz, as personal representative to Lena Horowitz's estate, became the substituted party.
[2] Section 458.320(2) sets forth the following financial responsibility requirements for physicians with hospital staff privileges:

(2) Physicians who perform surgery in an ambulatory surgical center licensed under chapter 395 and, as a continuing condition of hospital staff privileges, physicians who have staff privileges must also establish financial responsibility by one of the following methods:
(a) Establishing and maintaining an escrow account . . . in the per claim amounts specified in paragraph (b). . . .
(b) Obtaining and maintaining professional liability coverage in an amount not less than $250,000 per claim, with a minimum annual aggregate of not less than $750,000. . . .
(c) Obtaining and maintaining an unexpired irrevocable letter of credit, established pursuant to chapter 675, in an amount not less than $250,000 per claim, with a minimum aggregate availability of credit of not less than $750,000.
[3] The cases from these courts each involved malpractice that occurred in the hospitals.
[4] Although Beam was decided after section 458.320 was enacted, the court did not refer to this or any other statutory provision.
[5] The First District's reasoning is consistent with our recognition in McCain v. Florida Power Corp., 593 So.2d 500, 503 (Fla.1992), that "[f]oreseeability clearly is crucial in defining the scope of the general duty placed on every person to avoid negligent acts or omissions." In general, foreseeability as used in McCain and its progeny extends to the foreseeable risk of injury resulting from a negligent act, and not to the risk of financial injury that may result if the tortfeasor is unable to pay the monetary judgment awarded because of that negligent act.
[6] Horowitz argued for the first time on appeal, at oral argument before this Court, that a breach of the alleged statutory duty here could form the basis of a common law negligence claim. We need not decide whether this alternative theory is applicable because we conclude, based on our analysis below, that section 458.320 does not impose a statutory duty on hospitals to ensure the financial competence of staff-privileged physicians.
[7] See § 458.305(2), Fla. Stat. (2006).
[8] Prior to 2003, section 458.320(2) provided that "[a]s a continuing condition of hospital staff privileges, physicians with staff privileges shall also be required to establish financial responsibility." Ch.2003-416, § 23, 27, Laws of Fla.
[9] This is the reasoning of North Miami Medical Center, Ltd. v. Miller, 896 So.2d 886 (Fla. 3d DCA 2005), in which the Third District concluded that a hospital could not be liable for failing to ensure a physician's compliance with the statutory financial responsibility requirements if that physician made an election under section 458.320(5)(g).
[10] Section 395.0191 was originally enacted as section 395.011, Florida Statutes (Supp. 1982), but has been revised several times since. However, the provision has never imposed a duty on hospitals to ensure financial responsibility as a condition of granting staff privileges.
[11] Section 395.0193 was originally codified at section 395.0115, Florida Statutes (Supp. 1982), and has been revised several times since. However, the provision has never included a duty on the hospitals to discipline or revoke the staff privileges of physicians who fail to maintain financial responsibility.
[12] Section 766.110 was originally codified at section 768.60, Florida Statutes (1985). The language of this section has remained unchanged.