709 S.E.2d 85

**BEAUFORT COUNTY SCHOOL DISTRICT, Respondent,**

v.

**UNITED NATIONAL INSURANCE COMPANY, the South Carolina School Boards Insurance Trust, and the South Carolina School Boards Insurance Trust–Property/Casualty Trust Fund, Appellants.**

No. 4794.

Court of Appeals of South Carolina.

Heard Sept. 14, 2010.

Decided Feb. 23, 2011.

Rehearing Denied May 25, 2011.

508

510

David M. Dolendi, Catalina J. Sugayan, and Kirk C. Jenkins, all of Chicago, Illinois, Edward K. Pritchard, III, of Charleston, and Thomas C. Salane, of Columbia, for Appellants.

Frank S. Holleman, III, David H. Koysza, and J. Theodore Gentry, all of Greenville, for Respondent.

SHORT, J.

Beaufort County School District (Beaufort) filed this action against Appellants South Carolina School Boards Insurance Trust, South Carolina School Boards Insurance Trust—Property/Casualty Trust Fund (collectively, the Trust), and United National Insurance Company (United). Beaufort alleged breach of contract and bad faith, and sought compensatory and punitive damages, and a declaratory judgment regarding insurance coverage. The trial court granted Beaufort's motion for partial summary judgment on the issue of coverage. We affirm.

## FACTS

Beaufort and a number of other South Carolina school districts formed the Trust to pool their resources to obtain insurance coverage. The Trust purchased a comprehensive general liability insurance policy (the policy) to cover its district members, including Beaufort, for the year beginning July 1, 2003, and ending July 1, 2004. The terms of the policy provide that United will cover losses in excess of $150,000 in a

self-insured retention loss fund. The policy includes endorsements covering sexual abuse and sexual harassment.

In April and May 2004, seven students filed two lawsuits against Beaufort, alleging sexual molestation by an elementary school music teacher.[1] Beaufort settled the claims for $4.75 million and sought coverage under the endorsements.

The sexual abuse endorsement provides:

[C]overage is extended to include the following:

Coverage is provided for CLAIMS (as defined within this endorsement) ... arising out of SEXUAL ABUSE (as defined within this endorsement) by any employee or any volunteer worker of the NAMED ASSURED. This coverage is subject to ... the following special conditions and limitations:

. . . .

2. This coverage applies only if a CLAIM for damages, because of SEXUAL ABUSE, is "first made" against the ASSURED during the PERIOD OF INSURANCE.... **All CLAIMS based on or arising out of one SEXUAL ABUSE shall be considered "first made" when the first of such CLAIMS is made to the ASSURED, regardless of:**

 a. **The number of persons SEXUALLY ABUSED;**

. . . .

4. Limits: $500,000/$3,000,000 Annual Aggregate not to exceed $500,000 **per member** excess of $150,000 SELF INSURED RETENTION **each CLAIM**....

. . . .

8. The coverage extension under this endorsement does not apply to SEXUAL HARASSMENT, or to any CLAIMS arising from actual or alleged physical abuse arising out of SEXUAL HARASSMENT.

The sexual abuse endorsement includes a "DEFINITIONS" section as follows:

---

1. The teacher pled guilty to ten counts of indecent exposure, seven counts of lewd act on a minor, and one count of assault and battery of a high and aggravated nature. He is currently serving a twenty-five year prison sentence.

CLAIM: For the purposes of this endorsement only, **CLAIM means all notices or SUITS** demanding payment of money based on, or **arising out of the same SEXUAL ABUSE or series of SEXUAL ABUSES** by one or more employees or volunteer workers.

NAMED ASSURED: For the purposes of this endorsement only, NAMED ASSURED means the South Carolina School Board Insurance Trust Property/Casualty Trust Fund. NAMED ASSURED does not include any employee or volunteer worker.

SEXUAL ABUSE means any actual, attempted or alleged criminal sexual conduct **of a person by another person, or persons** acting in concert . . . which causes physical and/or mental injuries. SEXUAL ABUSE also includes actual, attempted or alleged criminal sexual molestation, sexual assault, sexual exploitation or sexual injury.

But **SEXUAL ABUSE does not include SEXUAL HARRASSMENT.**

**All CLAIMS based on or arising out of the same SEXUAL ABUSE or a series of related SEXUAL ABUSES by one or more employees or volunteer workers shall be deemed one SEXUAL ABUSE.**

Only one policy issued by the Company, one SELF INSURED RETENTION, and one EXCESS LIMIT OF INSURANCE is applicable to any one SEXUAL ABUSE.

SEXUAL HARASSMENT means any actual, attempted or alleged unwelcome sexual advances. . . .

. . . .

But **SEXUAL HARASSMENT does not include SEXUAL ABUSE.**

(Capitalization in original; bold added.)[2] The sexual harassment endorsement, using substantially the same language, provides limits of $850,000/$2,550,000.

The Trust paid $150,000 to Beaufort and United paid $500,000. The Trust and United deny further liability, arguing, inter alia, the seven settlements constitute one claim. The parties filed cross-motions for summary judgment. After

---

2. Hereinafter, quotations of the policy omit capitalization, and bold is added for emphasis.

a hearing, the trial court granted partial summary judgment to Beaufort, finding: (1) the seven settlements gave rise to seven claims; (2) the annual aggregate limits in each endorsement were available to Beaufort; (3) recovery under the sexual abuse endorsement did not preclude recovery under the sexual harassment endorsement for acts of sexual harassment; and (4) the Trust was required to pay the self-insured retention for each claim. Appellants filed a joint motion for reconsideration. After a hearing, the trial court denied the motion. This appeal followed.

## ISSUES ON APPEAL

I. Did the trial court err in holding Beaufort's settlements gave rise to seven claims?

II. Did the trial court err in holding Beaufort may access the entire aggregate annual limits?

III. Did the trial court err in holding Beaufort's settlements were covered by both the sexual abuse and sexual harassment endorsements?

IV. Did the trial court err in holding the Trust is liable to Beaufort for more than one self-insured retention?

## STANDARD OF REVIEW

When reviewing the grant of a summary judgment motion, appellate courts apply the same standard that governs the trial court under Rule 56(c), SCRCP, which provides that summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), SCRCP; *Fleming v. Rose*, 350 S.C. 488, 493, 567 S.E.2d 857, 860 (2002). On appeal from an order granting summary judgment, the appellate court will review all ambiguities, conclusions, and inferences arising in and from the evidence in a light most favorable to the non-moving party. *Willis v. Wu*, 362 S.C. 146, 151, 607 S.E.2d 63, 65 (2004).

## LAW/ANALYSIS

### I. Seven Claims

Appellants argue the trial court erred in holding Beaufort's settlements gave rise to seven claims, contending the only

reasonable interpretation of the endorsements, giving effect to each of the various provisions, is that the victims' claims constitute one claim because the same perpetrator committed each act of sexual misconduct. Beaufort contends, and the trial court found, there were seven claims because there were seven victims. We agree with Beaufort.

■ Insurance policies are subject to the general rules of contract construction. *Century Indem. Co. v. Golden Hills Builders, Inc.*, 348 S.C. 559, 565, 561 S.E.2d 355, 358 (2002). "Courts must enforce, not write, contracts of insurance. . . ." *USAA Prop. & Cas. Ins. Co. v. Clegg*, 377 S.C. 643, 655, 661 S.E.2d 791, 797 (2008) (quoting *Sloan Constr. Co. v. Central Nat'l Ins. Co.*, 269 S.C. 183, 185, 236 S.E.2d 818, 819 (1977)). The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language. *Schulmeyer v. State Farm Fire & Cas. Co.*, 353 S.C. 491, 495, 579 S.E.2d 132, 134 (2003). If the contract's language is clear and unambiguous, the language alone, understood in its plain, ordinary, and popular sense, determines the contract's force and effect. *Id.* An insurance contract is read as a whole document so that "one may not, by pointing out a single sentence or clause, create an ambiguity." *Yarborough v. Phoenix Mut. Life Ins. Co.*, 266 S.C. 584, 592, 225 S.E.2d 344, 348 (1976). However, an insurance contract which is "in any respect ambiguous or capable of two meanings must be construed in favor of the insured." *Reynolds v. Wabash Life Ins. Co.*, 251 S.C. 165, 168, 161 S.E.2d 168, 169 (1968).

## A. Definitions of the Terms of the Policy

■ Appellants argue the trial court's holding is not a reasonable interpretation of the policy's definition of "claim," or of the undefined terms "series" and "related." We disagree.

The policy's sexual abuse endorsement defines "sexual abuse" as "any actual, attempted or alleged criminal sexual conduct **of a person by another person, or persons** acting in concert. . . ." The sexual abuse endorsement defines "claim" as "all notices or suits . . . based on, or arising out of the same **sexual abuse or series of sexual abuses** by one or more

employees or volunteer workers." The endorsement also includes the following "related sexual abuses" clause: "All claims based on or arising out of the same **sexual abuse or a series of related sexual abuses** by one or more employees ... shall be deemed one sexual abuse." [3] Appellants rely on the phrases "series of sexual abuses" and "series of related sexual abuses" to assert there is only one claim arising from the abuse of the seven victims. Appellants contend the clause defines multiple claims arising from a series of related abuses as one claim, regardless of the number of victims.

The trial court relied on the incorporation of the definition of "sexual abuse" in the definition of the term "claim" and in the "related sexual abuses" clause to find seven claims. The court found that because the definition of "claim" incorporates the definition of "sexual abuse," the use of the singular "person" in reference to the victim in the definition of sexual abuse controls. Thus, according to the trial court, when the definition of "claim" refers to a series of sexual abuses, it is referring to a series of abuses against "a person." Likewise, the court concluded the "related sexual abuses" clause also incorporates the definition of "sexual abuse." The trial court found it significant that United used, in the definition of "sexual abuse," the singular "person" when referring to a victim, compared to its use of the singular and plural "person, or persons" when referring to the perpetrator(s). The court found the parties' intent, by the use of the singular "person" to describe the victim, distinguished the policy from the general rule that "the use of the singular in an insurance policy includes the plural unless it is clear that [the] parties intended otherwise." (quoting 2 *Couch on Insurance* § 22:5 (3d ed.2007)). The court found that United demonstrated clear understanding of how to articulate the concept of the plural when it wanted to in the endorsements, compelling its conclusion that the "difference has meaning." The trial court finally noted the close proximity of the singular and plural uses of the term "person" in the endorsement, and determined

---

**3.** The corresponding clauses of the sexual harassment endorsement are substantively identical, and the analysis for the sexual abuse endorsement applies to the sexual harassment endorsement for purposes of Appellants' "one claim" argument.

this proximity compels the conclusion United intended this difference.

The term "series" is not defined in the endorsements, so it must be defined according to the usual understanding of the ordinary person. See *Golden Hills Builders, Inc.*, 348 S.C. at 565, 561 S.E.2d at 358 (stating policy language must be given its plain, ordinary, and popular meaning). "Series" is defined as "a group of . . . things or events standing or succeeding in order and having a like relationship to each other. . . ." *Webster's Third New International Dictionary* 2073 (1971). The trial court found the language "series of sexual abuses" in the definition of "claim" referred to multiple instances of abuse involving a single victim.

The term "related" also is not defined in the endorsements, so it must be defined according to the usual understanding of the ordinary person. *See Golden Hills Builders, Inc.*, 348 S.C. at 565, 561 S.E.2d at 358 (stating policy language must be given its plain, ordinary, and popular meaning). The term "related" is defined as "connected by reason of an established or discoverable relation." *Webster's Third New International Dictionary* 1916 (1971).

The trial court found the appropriate reading of "a series of related sexual abuses" refers to a series of related abuses "of a person." It again relied on the language's incorporation of the definition of "sexual abuse," which expressly states that a sexual abuse is committed on "a person." The court read the language as limiting each victim to one claim, even if they were subjected to abuse multiple times, and finding one claim per victim. It concluded: "[T]his reading is at very least a reasonable interpretation of the provision that must be adopted because it favors coverage."

 We find no error by the trial court in its interpretation of the policy's definition of "claim," or the terms "series" and "related." A clause in an insurance policy will not be read in isolation. *Stewart v. State Farm Mut. Auto. Ins. Co.*, 341 S.C. 143, 151–52, 533 S.E.2d 597, 601 (Ct.App.2000). Like the trial court, when we consider the definitions of "claim," "series," and "related" in light of their use in the endorsements, and the definition of sexual abuse, we find the trial court's interpretation of the endorsements is reasonable. *See Quinn v.*

*State Farm Mut. Auto. Ins. Co.*, 238 S.C. 301, 304, 120 S.E.2d 15, 16 (1961) (finding where the words of an insurance policy are capable of two reasonable interpretations, the interpretation most favorable to the insured will be adopted).

## B. The Deemer Clause

■ Appellants next argue the trial court erred in finding the deemer clause was not relevant to the issue of the number of claims arising from Beaufort's settlement agreements. We disagree.

■ A deemer clause in an insurance contract deems a particular date in the progression of an injury as the triggering date for when the injury takes place for purposes of insurance coverage. Scott M. Seaman & Jason R. Schulze, *Allocation of Losses in Complex Insurance Coverage Claims* § 3:4 (2010), *available at* WL, ALCICC § 3:4. The deemer clause in the sexual abuse endorsement [4] provides: "All claims based on or arising out of one sexual abuse shall be considered 'first made' when the first of such claims is made to the assured, **regardless of ... [t]he number of persons sexually abused ....**" The trial court found "[t]he deemer clause addresses only the issue of *when* [c]laims are deemed to have arisen for purposes of triggering coverage in a given policy year, not *what* conduct constitutes a [c]laim." Therefore, the court found the deemer clause has no bearing on the separate question of how many claims are presented.

In *Western World Insurance Co. v. Lula Belle Stewart Center, Inc.*, the United States District Court concluded a deemer clause in a sexual molestation endorsement had no bearing on the issue of whether a series of related acts of molestation constituted more than one occurrence. 473 F.Supp.2d 776, 785 (E.D.Mich.2007). The court opined:

> As the courts have recognized, this coverage-triggering inquiry is analytically distinct from the question whether a policy treats a series of related acts or incidents as one or multiple occurrences. In *TIG Insurance [Co. v. Smart School,* 401 F.Supp.2d 1334 (S.D.Fla.2005) ], for instance,

4. The corresponding clause of the sexual harassment endorsement is substantively identical.

the court noted that "numerous cases involving occurrence policies" had "ma[d]e a distinction between the issue of whether and under what policy particular claims are covered versus the issue of whether, if there is coverage, the claims amount to more than one occurrence." 401 F.Supp.2d at 1347 (collecting cases). Similarly, in a case "present[ing] the question of what constitutes a separate 'occurrence'" under the policies at issue, the Sixth Circuit repeatedly emphasized that the portions of the policies addressing coverage-triggering issues—i.e., that specified "when and where an occurrence must take place for ... coverage to exist"—had no bearing on the distinct question of "the number of occurrences." *Michigan Chemical Corp. v. American Home Assurance Co.,* 728 F.2d 374, 378, 381–82 (6th Cir.1984).... Consistent with this distinction, the Court concludes that the "first occurs" policy language in this case is intended to address the trigger-of-coverage issue, and has no bearing upon the separate question whether a series of related acts of molestation should be treated as one or multiple occurrences.

*Id.; see also TIG Ins. Co. v. Smart School,* 401 F.Supp.2d 1334, 1347 (S.D.Fla.2005) (finding a deemer clause unrelated to the issue of whether separate claims constitute single or multiple occurrences); *TIG Ins. Co. v. Merryland Childcare & Dev. Ctr., Inc.,* 2007 WL 316571, at *6 (W.D.Tenn.2007) (quoting *Smart School* to find the deemer clause did not conflict with the definition of "sexual abuse occurrence"). We agree with the trial court that the deemer clause has no bearing on the issue of the number of claims in this case.

## C. Foreign Jurisdictions

Appellants maintain the trial court erred in relying on cases from foreign jurisdictions. We disagree.

Both parties cite decisions of other jurisdictions in support of their arguments. We do not regard any of the authorities cited as controlling because the policies involved in the cited decisions contain language different from the policy in this case.

The cases cited by Appellants primarily contain language defining "occurrences" or "sexual abuse occurrences" and find

sexual molestations of multiple victims by one perpetrator constitute one occurrence. *See Merryland Childcare*, 2007 WL 316571, at *2, *6 (finding abuse of multiple children constituted one "sexual abuse occurrence," defined as "[a] single act, or multiple, continuous, sporadic, or related acts of sexual abuse.... A 'sexual abuse occurrence' must occur while the claimant is in the care, custody or control of an insured...."); *Smart School*, 401 F.Supp.2d at 1342–44 (interpreting language identical to that in *Merryland Childcare* to reach the same conclusion); *TIG Ins. Co. v. San Antonio YMCA*, 172 S.W.3d 652, 661 (Tex.App.2005) (holding that although there were six "occurrences" under the general liability policy, there was only one "sexual abuse occurrence" where "sexual abuse occurrence" was defined as "a single act, or multiple, continuous, sporadic, or related acts of sexual molestation or abuse caused by one perpetrator"); *Preferred Risk Mut. Ins. Co. v. Watson*, 937 S.W.2d 148, 149–50 (Tex. App.1997) (finding "occurrence," defined in policy as "[a]ll acts of sexual misconduct by one person ...[,]" constituted one occurrence).

Contrarily, the cases cited by Beaufort generally contain language defining "claims" or "occurrences," and find sexual molestations of multiple victims, or multiple molestations of one victim, by one perpetrator, constitute multiple occurrences. *See Essex Ins. Co. v. Doe*, 511 F.3d 198, 201 (D.C.Cir. 2008) (finding four "claims" under the policy where there were four "occurrences" of sexual assault on one victim by four perpetrators); *Lee v. Interstate Fire & Cas. Co.*, 86 F.3d 101, 103–05 (7th Cir.1996) (finding the underlying facts, not merely policy language, determined if there were multiple "occurrences" where: (1) victim was abused during two policy periods in two distinct places where "occurrence" was defined as "an accident or ... a continuous or repeated exposure to conditions.... All such exposure to substantially the same general conditions ... shall be deemed one occurrence"; and (2) insurer failed in its burden of proof to show one "occurrence"); *Soc'y of the Roman Catholic Church of the Diocese of Lafayette & Lake Charles, Inc. v. Interstate Fire & Cas. Co.*, 26 F.3d 1359, 1364–65 (5th Cir.1994) (finding "definition of 'occurrence' affords little assistance because 'a continuous or repeated exposure to conditions' and 'substantially the same

general conditions' are malleable. An 'occurrence' could be the church's continuous negligent supervision of [two] priest[s], the negligent supervision of [two] priest[s] with respect to each [of 31] child[ren over seven years], the negligent supervision of [two] priest[s] with respect to each molestation[,]" and concluding each child suffered an 'occurrence' in each policy period in which he was molested); *State Farm Fire & Cas. Co. v. Elizabeth N.*, 9 Cal.App.4th 1232, 12 Cal.Rptr.2d 327, 329–30 (1992) (finding each molestation of a victim was not a separate occurrence, but the molestation of each victim was an occurrence where the policy stated that all bodily injury resulting from continuous or repeated exposure to the same general conditions would be deemed the result of one occurrence); *S.F. v. West Am. Ins. Co.*, 250 Va. 461, 463 S.E.2d 450, 452–53 (1995) (concluding the definition of occurrence was ambiguous as it could apply to either negligent hiring, supervision, or retention of the perpetrator, and construing the policy in favor of the insured to find seven occurrences as there were seven victims, but all abusive acts against each victim constituted one occurrence).

We find guidance in the discussion by the Fifth Circuit Court of Appeals in *H.E. Butt Grocery Co. v. National Union Fire Insurance Co.*, 150 F.3d 526 (5th Cir.1998). The court in *H.E. Butt Grocery Co.* stated that "while the decisions of other courts are not binding precedent under Texas law, most courts that have considered the question have concluded that the sexual molestation of different children constitutes separate occurrences." 150 F.3d at 532 (citing multiple jurisdictions that held the molestation of different children constituted separate occurrences). The court rejected the insurer's argument that a policy had to be found ambiguous before determining each child suffered a separate occurrence. *Id.* at 532–33. The court also rejected the insurer's contention that the insured's negligence could only be one "occurrence." *Id.* at 533–34. The court stated:

> We recognize that courts have not been uniform in their interpretation of "occurrence" under similar circumstances. The Virginia Supreme Court, without much analysis, found that "occurrence" was ambiguous with regard to the molestation of multiple children, but then concluded that the molestation of each child was a separate occurrence because

that was the interpretation favorable to the insured in that case. *See S.F. v. West Am. Ins. Co.,* 250 Va. 461, [464–65,] 463 S.E.2d 450, 452 (1995). The Nevada Supreme Court recently reached the opposite conclusion: it did not find "occurrence" to be ambiguous, yet the court concluded that the molestation of different children constituted only one occurrence when premised on the county's underlying negligence. *See Washoe County v. Transcontinental Ins. Co.,* 110 Nev. 798, [802–04,] 878 P.2d 306, 308–10 (1994). Even though the court recognized that "the actions of the individual wrongdoers are the most direct causes of harm for the victims," it "conclude[d] that the County's negligence in the licensing process and in its attendant duties to investigate and monitor [the day-care center] constitutes a single occurrence for purposes of liability." *Id.* We find, however, that the Nevada court's approach conflicts with the greater weight of authority. . . .

*Id.* at 534; *see Interstate Fire & Cas. Co. v. Archdiocese of Portland,* 35 F.3d 1325, 1330 (9th Cir.1994) (concluding "the 'occurrence' is not the . . . negligent supervision of [the perpetrator] . . ., but, rather, the *exposure* of the [victim] to the negligently supervised [perpetrator]").

We also find persuasive the reasoning employed by the court in the recent case of *Lantana Insurance, Ltd. v. Ritchie,* 2010 WL 3749084 (N.D.Fla. Sept.17, 2010). In *Lantana,* the sexual abuse endorsement provided coverage for claims resulting from "an incident of abuse." *Lantana* at * 1. The policies at issue also provided: "Multiple incidents of abuse caused by one perpetrator . . . shall be deemed to be a single incident of abuse. . . ." *Id.* at *2. The court found a plain reading of the language limited multiple acts of sexual abuse against one child to one "incident" under the policy. *Id.* at *3. However, the court concluded that "it is unclear whether 'incident' also includes multiple child victims." *Id.* Finding the language of the endorsement reasonably susceptible to both interpretations, the court interpreted the policy in favor of the insureds. *Id.* at *3, *5.

Our review of the cases cited by the parties, and other cases, does not change our conclusion that, under the terms of this policy, the molestation of seven victims gives rise to seven claims. *See S.S. Newell & Co. v. Am. Mut. Liab. Ins. Co.,* 199

S.C. 325, 332, 19 S.E.2d 463, 466 (1942) ("[T]he express terms and language the parties have used should be given effect [when interpreting an insurance policy] and their intention must be derived from the language employed.").

## II. Annual Aggregate in the Limits Clause

Appellants argue the trial court erred in holding Beaufort could access the annual aggregate limits in the sexual abuse and sexual harassment endorsements. We disagree.

The sexual abuse endorsement includes a limits clause providing coverage limits of "$500,000/$3,000,000 Annual Aggregate not to exceed $500,000 **per member** excess of $150,000 self-insured retention **each claim**." The sexual harassment endorsement provides limits of $850,000/$2,550,000.

### A. One Claim

Appellants initially argue the trial court erred in reaching the issue of whether Beaufort could access the annual aggregate limits of the endorsements because there is only one claim. This issue is decided in our discussion in the foregoing section, in which we find seven claims arose from the seven settlements.

### B. Construction of the Limits Clause

Appellants next assert the trial court erred in construing the limits clause by failing to give separate meaning to the "per member" language in the clause. We disagree.

Appellants argue the annual aggregate limits are "pool" limits intended for all members of the Trust collectively, and that Beaufort, as one member of the Trust, is entitled only to the "sub-limits" in the endorsements. Appellants argue the trial court ignored the phrase "per member," and the aggregate limits are the amounts available to all members of the Trust per policy period.

The trial court found Appellants' construction of the limits clause ignored the phrase "per claim." It determined the endorsements employed "the familiar 'per-claim limit/aggregate limit' formulation routinely found in insurance policies." The court concluded restricting Beaufort to the "per-claim

limit" "focuses only on the phrase 'per member' and ignores the phrase 'each Claim,' which appears in the same sentence."

We find the trial court's interpretation of the limits clause is reasonable. A party "may not, by pointing out a single sentence or clause, create an ambiguity." *Yarborough v. Phoenix Mut. Life Ins. Co.*, 266 S.C. 584, 592, 225 S.E.2d 344, 348 (1976). Where the words of an insurance policy are capable of two reasonable interpretations, the interpretation most favorable to the insured will be adopted. *Quinn v. State Farm Mut. Auto. Ins. Co.*, 238 S.C. 301, 304, 120 S.E.2d 15, 16 (1961). An insurance contract which is "capable of two meanings must be construed in favor of the insured." *Reynolds v. Wabash Life Ins. Co.*, 251 S.C. 165, 168, 161 S.E.2d 168, 169 (1968).[5]

## C. Patent or Latent Ambiguity

Appellants maintain the language of the limits clause unambiguously limits Beaufort to $500,000 in coverage, but that if an ambiguity exists, the trial court erred in refusing to permit extrinsic evidence to resolve the ambiguity. We disagree.

"When a contract is unambiguous, clear and explicit, it must be construed according to the terms the parties have used, to be taken and understood in their plain, ordinary and popular sense." *C.A.N. Enters., Inc. v. S.C. Health & Human Servs. Fin. Comm'n*, 296 S.C. 373, 377–78, 373 S.E.2d 584, 586 (1988). Extrinsic evidence may not be used to create an ambiguity in an otherwise unambiguous policy. *Yarborough*, 266 S.C. at 592, 225 S.E.2d at 348 (finding it appropriate to consider extrinsic evidence only if an ambiguity exists

---

5. In their Reply Brief, Appellants argue the phrase "each claim" does not modify the phrase "per member," but instead modifies the phrase "self-insured retention." An appellant may not raise additional arguments in the reply brief that were not raised in the initial brief. *Glasscock, Inc. v. United States Fid. & Guar. Co.*, 348 S.C. 76, 81, 557 S.E.2d 689, 692 (Ct.App.2001). Therefore, we need not consider this argument. In any event, we find it reasonable to interpret "each claim" as modifying either "per member" or "self-insured retention" and, therefore, affirm the trial court. *See Quinn*, 238 S.C. at 304, 120 S.E.2d at 16 (stating where words of an insurance policy are capable of two reasonable interpretations, the interpretation most favorable to the insured will be adopted).

within the policy). Even if an ambiguity exists in a contract, extrinsic evidence may not be considered if the ambiguity is a patent ambiguity. *Smith v. Coxe,* 183 S.C. 509, 516, 191 S.E. 422, 425–26 (1937) (finding parol testimony may be received in construing instrument with latent ambiguity); *Polson v. Craig,* 351 S.C. 433, 437 n. 2, 570 S.E.2d 190, 192 n. 2 (Ct.App.2002) (involving a will, and noting extrinsic evidence is admissible when there is a latent ambiguity, not a patent ambiguity); *Bob Jones Univ. v. Strandell,* 344 S.C. 224, 231, 543 S.E.2d 251, 254 (Ct.App.2001) ("A court may admit extrinsic evidence to determine whether a latent ambiguity exists.").

A patent ambiguity is one that arises upon the words of a will, deed, or contract. *Smith,* 183 S.C. at 516, 191 S.E. at 425–26. A latent ambiguity exists when there is no defect arising on the face of the instrument, but arising when attempting to apply the words of the instrument to the object or subject described. *Id.* (offering an example of a latent ambiguity as a named beneficiary in a will that is unambiguous on the face of the will, but creates a latent ambiguity where there are two people with that name). Interpretation of an unambiguous policy, or a policy with a patent ambiguity, is for the court. *Hann v. Carolina Cas. Ins. Co.,* 252 S.C. 518, 526–27, 167 S.E.2d 420, 423 (1969); *B.L.G. Enters., Inc. v. First Fin. Ins. Co.,* 328 S.C. 374, 377, 491 S.E.2d 695, 697 (Ct.App.1997), *aff'd,* 334 S.C. 529, 514 S.E.2d 327 (1999). Interpretation of a policy with a latent ambiguity is for the jury. *Wheeler v. Globe & Rutgers Fire Ins. Co.,* 125 S.C. 320, 329, 118 S.E. 609, 612 (1923) (Cothran, J., dissenting).

Appellants proffered numerous items in support of their interpretation of the limits clause. Appellants first proffered the affidavit of Randy Plyler, the Director of Risk Management for the Trust. Plyler stated he was involved in the negotiation and purchase of the insurance policy, and the sublimit was the maximum available coverage for all sexual abuse claims for a member in a given year. Plyler stated the aggregate is the maximum coverage available to all members combined. Plyler relied in part on the Trust Fund Agreement and the Coverage Agreement.

Article VI of the Trust Fund Agreement provides the trustees of the Trust with the authority to determine coverage

questions. The Coverage Agreement is a document distributed by the Trust to its members.[6] On the second page of the Coverage Agreement, in the Declarations section summarizing the limits of liability, the agreement provides: "Sexual Abuse—Each Claim—$500,000; Aggregate Each Agreement Period Per Member—$500,000; Deductible—$0; *Pool Shared Aggregate Each Agreement Period*—$3,000,000."

The trial court refused to consider Appellants' extrinsic evidence, finding Appellants relied on extrinsic evidence essentially to buttress their interpretation of the policy, which is not an appropriate use of extrinsic evidence. The court concluded its interpretation of the limits language was reasonable, and must be adopted as a matter of law because it favored coverage.

We find even if the policy contains an ambiguity, it is a patent ambiguity as it arises from the language of the policy itself. Therefore, we conclude the trial court did not err in refusing to consider the extrinsic evidence proffered by Appellants.

### III. Sexual Harassment Endorsement

■ Appellants argue the trial court erred in finding the settlements were covered by both the sexual abuse and sexual harassment endorsements. We disagree.

■ The rules of contract construction require exclusionary clauses to be narrowly interpreted. *Buddin v. Nationwide Mut. Ins. Co.*, 250 S.C. 332, 337, 157 S.E.2d 633, 635 (1967). Where the words of a policy are capable of two reasonable interpretations, the court will adopt the construction most favorable to the insured. *Pitts v. Glens Falls Indem. Co.*, 222 S.C. 133, 137, 72 S.E.2d 174, 176 (1952).

The sexual abuse endorsement defines sexual abuse as "any actual, attempted or alleged criminal sexual conduct of a person by another person, or persons acting in concert ... which causes physical and/or mental injuries.... Sexual abuse

---

6. At the hearing on the cross-motions for summary judgment, Beaufort argued the Coverage Agreement submitted to the court covered the year following the policy year at issue in this case. The Coverage Agreement in the record states "05 07 04," and explains the policy provides coverage for sexual abuse in the policy, rather than the coverage at issue here, which is provided for in the endorsements.

also includes actual, attempted or alleged criminal sexual molestation, sexual assault, sexual exploitation or sexual injury." The sexual harassment endorsement defines sexual harassment as "any actual, attempted or alleged unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature of a person by another person, or persons acting in concert, which causes mental injuries." The endorsements state: "sexual abuse does not include sexual harassment" and "sexual harassment does not include sexual abuse."

Appellants argue even if the victims were the target of acts of misconduct that meet the definition of sexual harassment, their claims would always arise from sexual abuse. They argue the definition of "claim" is broader than a single act of misconduct, as it is defined as "all notices or suits demanding payment of money based on, or arising out of the same sexual abuse or series of sexual abuses. . . ." Beaufort concedes it may not receive double recovery by coverage under both the sexual abuse and sexual harassment endorsements, but argues recovery under the sexual abuse endorsement does not preclude recovery under the sexual harassment endorsement for acts of sexual harassment.

The trial court agreed with Beaufort, finding to accept Appellants' interpretation of the endorsements would lead to the absurd result of no coverage any time a claim arose from conduct that meets the definitions of both sexual abuse and sexual harassment. Appellants disagree with this finding and maintain they never argued the two endorsements cancel each other out. Rather, they assert the trial court focused on whether an act of sexual abuse could meet the definition of sexual harassment, instead of the language in the sexual harassment endorsement excluding coverage for a "claim" arising directly or indirectly from sexual abuse.

We find no error by the trial court. The complaint in this case alleges the victims suffered both sexual abuse and sexual harassment. As the trial court found, if interpreted as argued by Appellants, the endorsements would cancel each other out any time a claim arose from conduct that meets the definitions of both sexual abuse and sexual harassment. Thus, no coverage would be available at all for conduct that plainly meets both definitions.

 Finally, Appellants argue the sexual harassment endorsement includes an "anti-stacking" provision, providing:

> The coverage extension under this endorsement does not apply to any claim arising from actual or alleged physical abuse arising out of sexual harassment of any kind or to any claim seeking damages, including defense of same, arising directly or indirectly from any actual or alleged participation in any act of sexual abuse of any person by any assured.

Appellants argue the trial court erred in refusing to interpret this provision as an "anti-stacking" provision. "Stacking is defined as the insured's recovery of damages under more than one policy until all of his damages are satisfied or the limits of all available policies are met." *Giles v. Whitaker*, 297 S.C. 267, 268, 376 S.E.2d 278, 279 (1989). "Stacking does not depend upon the number of policies issued but rather the number of additional coverages for which the insured has contracted." *Ruppe v. Auto–Owners Ins. Co.*, 329 S.C. 402, 404 n. 3, 496 S.E.2d 631, 632 n. 3 (1998). Generally, an insured may stack policies unless limited by statute or by a valid policy provision. *Id.* at 404, 496 S.E.2d at 631–32.

 We find the law governing "anti-stacking" provisions does not apply because there is no attempt in this case to apply multiple policies to one event. Rather, the issue is one of applying coverage to multiple events. In this case, there is one policy with two endorsements providing coverage for different risks.

We affirm the trial court's finding that recovery under the sexual abuse endorsement does not preclude recovery under the sexual harassment endorsement for acts of sexual harassment. Construing the policy in this manner does not provide double recovery, as conceded by Beaufort. The victims have alleged acts of sexual abuse and sexual harassment. Whether the claims asserted by the victims constitute sexual abuse or sexual harassment under the terms of the endorsements remains to be determined at trial.

## IV. Self–Insured Retentions

 Appellants finally argue the trial court erred in holding the Trust is required to pay the self-insured retention for

each claim. They claim the trial court: (1) granted relief beyond the scope of Beaufort's summary judgment motion because it interpreted the Trust Agreement, which was not at issue in the cross-motions for summary judgment and is still in dispute; and (2) misinterpreted the Trust's arguments. We disagree.[7]

In its Answer, the Trust admits "it is obligated under the Trust agreements to indemnify members or assume from trust funds the self-insured retention under the Policy" and that "the insurance program established by the Trust agreements provides for only those coverages/limits provided for by the Policy and one Self–Insured Retention per occurrence/claim. . . ." Beaufort raised the issue in its Memorandum in Support of Beaufort's Motion for Partial Summary Judgment. Beaufort argued: "The Trust . . . pays any self-insured retention ("SIR") applicable to its members under coverage obtained by the Trust." Beaufort also maintained: "The Trust is obligated to pay the $150,000 Self–Insured Retention for each of the seven Claims, or a total of $1,050,000."

The issue was also raised to the trial court in the Trust's "Supplemental Memorandum in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment." In its Memorandum, the Trust argued the issue of its obligation under the policy is limited to payment of a single self-insured retention of $150,000.

Finally, the issue was again raised at the hearing on the cross-motions for summary judgment. When arguing for the trial court to consider extrinsic evidence, the Trust acknowledged Beaufort's contention the Trust is "the entity responsible for multiple [self-insured retentions.]" Beaufort argued if the trial court found seven claims, the Trust would not have the power to change the language in the policy. The Trust

---

7. The Trust also argues it views the claim of negligent hiring, retention, or supervision of the perpetrator as constituting a single claim with only a single self-insured retention. This is essentially another argument regarding the number of claims, discussed in Section I. *See Soc'y of the Roman Catholic Church of the Diocese of Lafayette & Lake Charles, Inc. v. Interstate Fire & Cas. Co.*, 26 F.3d 1359, 1364–65 (5th Cir.1994) (finding multiple occurrences could arise from continuous negligent supervision of perpetrators).

responded: "then that opens the Trust up to the payment of seven single self-insured retentions of $150,000, which was never in the contract." The Trust argued:

> The first thing that I want the Court to understand under the policy provisions is that [the Trust's] obligations under the policy are only to pay $150,000 after the self-insured retention has been paid. That is, if you take a look at the policy and look at the sexual abuse endorsement ... [w]hat that is saying is that [the Trust] doesn't have to pay more than one self-insured retention.
>
> Now, [Beaufort's] interpretation would suggest that now [the Trust] has to pay a self-insured retention of $150,000 for each claim, each individual victim, and that is simply not the case.

In concluding the Trust was liable for seven self-insured retentions, the trial court relied on the endorsements and pleadings. The clauses containing the coverage limits in each endorsement provide that the limits are in "excess of $150,000 self insured retention **each claim.**" The court found the clause "each claim" entails a $150,000 self-insured retention, and there were seven claims. Thus, the Trust was responsible for seven retentions. The court discounted the Trust's reliance on the clause in each endorsement, which provides: "The coverage extension under this endorsement does not increase the Self Insured Retention nor the Excess Limit of Insurance of this policy," finding the clause did not contradict the plain language in the endorsements providing for limits of $150,000 for *each claim.*

 We find the Trust's issues were fully raised, within the scope of the cross-motions for summary judgment, and correctly interpreted by the trial court.[8] *See generally* Rule 15(b), SCRCP (stating issues not raised by the pleadings but tried by consent of the parties shall be treated as if they had been raised in the pleadings); *Staubes v. City of Folly Beach,* 339 S.C. 406, 414, 529 S.E.2d 543, 547 (2000) (citing Rule 15(b),

---

8. Beaufort argues the issues raised by the Trust are not preserved for appellate review because although raised at the Rule 59(e) hearing, the issues were not included in the Rule 59(e) motion. In the Rule 59(e), SCRCP, motion to reconsider, Appellants argued: "The Court erroneously found that [the Trust] must pay more than one self insured retention in that under the plain language of the Policy and Trust

SCRCP, and finding although the issue of negligence was not pled, it was raised at the summary judgment hearing and thus the trial court "obviously treated the complaint as if it had been amended"); *Murray v. Holnam, Inc.,* 344 S.C. 129, 136 n. 1, 542 S.E.2d 743, 747 n. 1 (Ct.App.2001) (finding an amendment to a complaint was impliedly consented to in a summary judgment hearing); *Marietta Garage, Inc. v. S.C. Dep't of Pub. Safety,* 337 S.C. 133, 137, 522 S.E.2d 605, 607 (Ct.App.1999) (finding a claim preserved, despite its omission from an amended complaint, because it was raised in the summary judgment and Rule 59 motions without objection).

## CONCLUSION

For the foregoing reasons, the trial court's order granting partial summary judgment to Beaufort County is

**AFFIRMED.**

THOMAS and LOCKEMY, JJ., concur.

---

documents, [the Trust] is only required to pay a total self insured retention of $150,000 as a result of the underlying litigation." The arguments were discussed at the hearing on the motion to reconsider. The trial court permitted the parties to submit supplemental memoranda. The trial court denied Appellants' motion to reconsider. Therefore, we find the Trust's issues preserved for appeal. *See Pye v. Estate of Fox,* 369 S.C. 555, 566, 633 S.E.2d 505, 511 (2006) (finding an issue preserved where it was raised at the summary judgment and Rule 59(e) motions hearings).