# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Chris Katina McCord, Christopher McCord, Janice Sherfield, and Jerry Sherfield, Appellants,

v.

Laurens County Health Care System and Greenville Health System, Respondents.

Appellate Case No. 2017-001064

Appeal From Laurens County
Eugene C. Griffith, Jr., Circuit Court Judge

Opinion No. 5705
Heard October 22, 2019 – Filed January 8, 2020

**AFFIRMED**

Joseph Grady Wright, III, and Jay Franklin Wright, both of McGowan Hood & Felder, LLC, of Greenville, for Appellants.

H. Sam Mabry, III, J. Ben Alexander, and Kenneth Norman Shaw, all of Haynsworth Sinkler Boyd, PA, of Greenville, for Respondents.

**HILL, J.:** This appeal presents the question of whether a hospital, by virtue of either the language in its admission contract or an alleged special relationship with its patients, owes a duty to ensure a doctor practicing at the hospital maintains malpractice insurance coverage. Because we hold under these specific facts that Laurens County Health Care System and its successor Greenville Health System

(collectively, Hospital) had no such duty to Appellants in contract or tort, we affirm the trial court's grant of summary judgment to Hospital.

## I.

Mrs. McCord and Mrs. Sherfield suffered complications following surgeries performed by Dr. Byron Brown, a local OB/GYN, at Hospital between December 2008 and May 2009. Concerns about Dr. Brown's competency arose when another of his surgical patients was re-admitted to Hospital with complications in October 2009. Hospital medical staff reviewed charts of Dr. Brown's patients in early December 2009, and Dr. Brown relinquished some surgical privileges on December 15, 2009. The Hospital suspended him in January 2010, and he relinquished all privileges in May 2011.

In 2014, Mrs. McCord and Mrs. Sherfield obtained default judgments against Dr. Brown for malpractice for $1,740,692.75 and $1,468,580, respectively; their spouses, Mr. McCord and Mr. Sherfield, obtained default judgments against Dr. Brown for loss of consortium for $58,789.04 and $50,000, respectively. Hospital was not a party to those actions. Appellants were unable to collect their judgments because there was no insurance covering their claims and Dr. Brown had moved to New Zealand. At the time of Mrs. McCord and Mrs. Sherfield's surgeries, Dr. Brown had a "claims-made" medical malpractice insurance policy through Joint Underwriting Association (JUA) with coverage limits of $200,000 per claim and $600,000 annual aggregate coverage, and excess coverage. In July 2009, Dr. Brown switched his medical malpractice insurance from JUA to MAG Mutual, but he declined to purchase either "prior acts" coverage from MAG or "tail" coverage from JUA that would have covered claims based on acts or omissions occurring before the effective date of the MAG policy.

Before their surgeries, Mrs. McCord and Mrs. Sherfield signed a form entitled "Conditions of Admission" (the Admission Contract), which provided, "The undersigned agrees he signs as agent or as patient that in consideration of the *services to be rendered* to that patient, he hereby individually obligates himself to pay the account of the hospital, in accordance with the regular rates and terms of the hospital." (emphasis added). The Admission Contract also provided, "[T]he hospital is not responsible for any act or omission of the physicians. . . . The undersigned recognizes that most medical staff members furnishing services to the patient, including the radiologists, pathologist, anesthesiologists, and the like (are) independent contractors and not employees of the hospital."

Hospital's medical staff bylaws (the Bylaws) provided medical staff "shall maintain valid professional liability insurance coverage in the amounts deemed necessary by the Board from time to time and shall provide a current certificate of insurance as recommended."

Based on Hospital's interest in having OB/GYNs practicing locally, Hospital subsidized Dr. Brown's practice, though he was free to admit patients at other hospitals. The Subsidy Contract between Hospital and Dr. Brown provided:

> The physician shall furnish to the Hospital proof of insurance. Said policy shall cover professional liability in a minimum amount of $1,000,000 per claim/$3,000,000 aggregate or JUA/PCF coverage. Physician shall furnish to the Hospital evidence that the premium on said policy is prepaid and that said policy is in full force and effect. Further, Physician shall notify his insurance company that if said policy is canceled for any reason, notice of cancellation shall be provided by insurance company to the C.E.O. of the Hospital.

Appellants alleged in their complaint Hospital breached the Admission Contract when it failed to ensure Dr. Brown complied with the Bylaws and Subsidy Contract by maintaining medical malpractice insurance to cover their claims, which Appellants contend was part of the "services to be rendered" to them as patients. Appellants also alleged Hospital failed to exercise due care in its "special relationship" with Appellants by failing to ensure Dr. Brown complied with the Bylaws and Subsidy Contract requiring him to maintain medical malpractice insurance to cover their claims.

In granting summary judgment to Hospital, the trial court found the meaning of "services to be rendered" in the Admission Contract was unambiguous and referred "to those services that the Hospital actually provides and bills for, such as room charges, medications, and meals, not ensuring that an independent physician has medical malpractice insurance."

As to Appellants' negligence cause of action, the trial court found that even assuming there was a special relationship between the parties, Hospital had no duty to ensure Dr. Brown had medical malpractice insurance to cover Appellants' claims because (1) there was no evidence Dr. Brown failed to comply with the requirements of the Bylaws or Subsidy Contract, as it was undisputed he had the required insurance at the time of Appellants' surgeries, and (2) even if Dr. Brown were required to

purchase tail or other coverage, Appellants were not the intended beneficiaries of such a requirement.

This appeal followed.

## II.

In reviewing a grant of summary judgment, we apply the same standard as the trial court under Rule 56(c), SCRCP: we view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *See Gibson v. Epting*, 426 S.C. 346, 350, 827 S.E.2d 178, 180 (Ct. App. 2019). The moving party is entitled to summary judgment only if "there is no genuine issue as to any material fact." Rule 56(c), SCRCP. However, a genuine issue of material fact exists—and summary judgment must be denied—if the non-moving party submits at least a scintilla of evidence supporting each element of its claim. *Hancock v. Mid-S. Mgmt. Co.*, 381 S.C. 326, 330, 673 S.E.2d 801, 803 (2009). "[A] scintilla is a perceptible amount. There still must be a verifiable spark, not something conjured by shadows." *Gibson*, 426 S.C. at 352, 827 S.E.2d at 181.

## III. Breach of Contract

To prove a breach of contract, the burden is on the plaintiff to establish the contract, its breach, and proximate damages. *Fuller v. E. Fire & Cas. Ins. Co.*, 240 S.C. 75, 89, 124 S.E.2d 602, 610 (1962). Our role in interpreting a contract is to enforce the parties' intent. We look first to the language of the contract. If that language is clear and unambiguous, "the language alone, understood in its plain, ordinary, and popular sense, determines the contract's force and effect." *Beaufort Cty. Sch. Dist. v. United Nat. Ins. Co.*, 392 S.C. 506, 516, 709 S.E.2d 85, 90 (Ct. App. 2011). In such instances, we must enforce the language as written, for it is the objective expression of what the parties meant to agree upon when they made their contract, not the secret, subjective meaning one party later reveals. *Rodarte v. Univ. of S.C.*, 419 S.C. 592, 603, 799 S.E.2d 912, 917–18 (2017).

"Ambiguity of a contract is a question of law, which we review de novo." *Gibson*, 426 S.C. at 351, 827 S.E.2d at 181. To be ambiguous, contract language must be susceptible to two different but plausible meanings. *See S.C. Dep't of Nat. Res. v. Town of McClellanville*, 345 S.C. 617, 623, 550 S.E.2d 299, 302 (2001) ("A contract is ambiguous when the terms of the contract are reasonably susceptible of more than one interpretation."). "[U]nambiguous terms of a written contract may not be altered by parol evidence." *Gibson*, 426 S.C. at 352, 827 S.E.2d at 181.

The term at issue—"services to be rendered"—is not defined by the Admission Contract. It appears under the heading "Financial Agreement." Hospital interprets the phrase to mean tangible services it provides and bills for, such as room charges, medications, and meals. Appellants argue an equally reasonable interpretation is that the "services" Hospital agreed to provide included a guarantee the treating physicians would be covered by malpractice insurance sufficient to pay for any medical negligence committed during Appellants' treatment.

Appellants also say the term "services to be rendered" may be reasonably interpreted to include a promise by Hospital that doctors it credentialed and privileged were in compliance with the Bylaws and the Subsidy Contract. Appellants point to South Carolina Department of Health and Environmental Control (DHEC) regulations requiring hospitals to have an organized medical staff that operates pursuant to bylaws. S.C. Code Ann. Regs. 61-16 § 504 (Supp. 2019) ("The hospital shall have a medical staff organized in accordance with the facility's by-laws and accountable to the governing body including, but not limited to the quality of professional services provided by individuals with clinical privileges."). In essence, Appellants contend that because statutory law is implicitly incorporated into every contract, the Bylaws became part of Hospital's contracts with Appellants. *Inabinet v. Royal Exch. Assur. of London*, 165 S.C. 33, 36, 162 S.E. 599, 600 (1932) ("Every contract entered into in this state embodies in its terms all applicable laws of the state just as completely as if the contract expressly so stipulated."). The Bylaws required Dr. Brown to "maintain" malpractice coverage to keep his privileges. Appellants claim the term "maintain" is ambiguous and can reasonably be understood as requiring Dr. Brown to keep coverage in place adequate to respond to his patients' loss, regardless of when the malpractice occurred. Therefore, according to Appellants, a jury issue existed as to the meaning of "maintain," precluding summary judgment.

Accepting Appellants' argument would require us to discover two material ambiguities: one as to the meaning of "services to be rendered"; another as to the meaning of "maintain." We cannot follow Appellants to where their argument leads. Even if the DHEC regulations became part of the Admission Contract by operation of law, Appellants are asking us to go several steps further and not only incorporate the specific terms of the Bylaws themselves into the Admission Contract but also the terms of a contract authorized by the Bylaws.

This is a bridge too far. We conclude as a matter of law that the phrase "services to be rendered" was plain and unambiguous. No reasonable contracting party would

contemplate that "services to be rendered" by a hospital would include the monitoring of the treating doctors' compliance with malpractice insurance requirements imposed by the hospital and the board. The plausibility of such a reading dwindles further when it is remembered the parties agreed that Hospital was "not responsible for any act or omission of the physicians." And the Admission Contract never references the Bylaws or the Subsidy Contract.

Because the Admission Contract was unambiguous, the parties' intentions must be determined from the contract language itself. *See Beaufort Cty. Sch. Dist*, 392 S.C. at 516, 709 S.E.2d at 90. Considering the phrase "services to be rendered" in its plain, ordinary, and popular sense, we conclude it meant tangible services Hospital billed for, such as medical care, room charges, and medications. Although Mrs. McCord and Mrs. Sherfield assert their subjective intent when executing the Admission Contract was for Hospital to require Dr. Brown to have medical malpractice insurance covering their claims, no language in the Admission Contract resembled such a requirement. *See Rodarte*, 419 S.C. at 603, 799 S.E.2d at 917–18.

Appellants deny they are seeking to be third party beneficiaries of Hospital's Bylaws and the Subsidy Contract. Instead they insist their theory is a "direct" action based on the Admission Contract. Accordingly, because that language is not ambiguous, we affirm summary judgment.

## IV. Tort Duty Based on Special Relationship/Hospital Corporate Negligence

We next address Appellants' argument that their status as patients imposed a duty on Hospital to use due care in granting and monitoring hospital privileges. Appellants assert Hospital breached this duty by continuing to grant Dr. Brown privileges when they knew or should have known he had declined prior acts and tail coverage that would have covered claims based on malpractice occurring before July 2009 and by failing to require Dr. Brown to purchase the coverage. Appellants note Hospital knew of Dr. Brown's competency issues before January 2010, when it could have purchased these coverages directly from the insurer.

The threshold problem we see with this argument is that South Carolina law does not require a physician to carry malpractice insurance. Appellants in essence believe Hospital's duty of care extended to forcing Dr. Brown to purchase or be covered by tail or other malpractice insurance sufficient to cover medical negligence claims for all treatment he administered at Hospital, regardless of when a claim is made. Appellants are not asking us to hold a hospital, by virtue of its special relationship with its patients, has a duty to ensure physicians practicing at hospital facilities be

insured for malpractice; they are asking us to hold that because Hospital granted Dr. Brown privileges in return for his promise to carry malpractice insurance while practicing and comply with Hospital Bylaws, Hospital had a duty to ensure the insurance coverage extended to their loss. Hospital responds that Dr. Brown's contractual obligation only went as far as requiring him to be insured at the time of the treatment, and it is undisputed he was. Appellants counter that this proves Hospital's negligence, for a reasonable hospital would have known the vagaries of malpractice policy language, claims practice, and coverage, and made sure physicians practicing in their facilities had adequate insurance to cover any malpractice committed regardless of when the claim arose or was made. They point to evidence in the record demonstrating the Hospital employee overseeing the insurance verification was ignorant of basic insurance principles. While Appellants' argument is creative, we cannot create liability against Hospital under the circumstances here, as sympathetic as we are to Appellants' loss.

In tort law, the existence of a duty is a question of law. *See Nelson v. Piggly Wiggly Cent., Inc.*, 390 S.C. 382, 388, 701 S.E.2d 776, 779 (Ct. App. 2010). Even if a party acts negligently and injures another, he will not be liable under the law of negligence unless his actions violated a specific legal duty owed to the other party. *See Brown v. S.C. Ins. Co.*, 284 S.C. 47, 51, 324 S.E.2d 641, 644 (Ct. App. 1984) ("Negligent conduct becomes actionable only when it violates some specific legal duty owed to the plaintiff."), *overruled on other grounds by Charleston Cty. Sch. Dist. v. State Budget & Control Bd.*, 313 S.C. 1, 437 S.E.2d 6 (1993). In general, our common law recognizes no affirmative duty to control the conduct of another or to warn a third person of danger. *See Johnson v. Jackson*, 401 S.C. 152, 160, 735 S.E.2d 664, 668 (Ct. App. 2012) ("Under South Carolina common law, there is no general duty to control the conduct of another or to warn a third person or potential victim of danger"); Patrick Hubbard & Robert L. Felix, *The South Carolina Law of Torts* at 106 (4th ed. 2011) ("Although there is no general duty to aid or protect others, such a duty does exist where the defendant has a special relationship to the victim."); *see also* William L. Prosser & W. Page Keeton, *The Law of Torts*, § 56 at 384 (5th ed. 1984) (discussing special relationship doctrine and noting a hospital "may be liable for permitting an unqualified doctor to treat a patient on its premises"). "An affirmative legal duty may be created by statute, a contractual relationship, status, property interest, or other special circumstance." *See Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 136, 638 S.E.2d 650, 656–57 (2006); *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 320 S.C. 49, 54, 463 S.E.2d 85, 88 (1995) (engineer owed special duty in tort to contractor based on engineer's professional duties despite lack of contract between engineer and contractor).

Here, Appellants claim they have a special relationship with Hospital, as the providing of health care entails more than a mere economic transaction. By entrusting their health care to Hospital, Appellants contend Hospital implicitly assumed a duty of due care toward them to allow hospital privileges only to doctors who could financially respond to any damages.

What Appellants are urging us to do is extend the special relationship concept and recognize the theory of hospital corporate negligence, a doctrine accepted in numerous states, that imposes a duty of due care on hospitals based on the reality of their responsibility for patient safety and well-being, despite whatever intricate personnel structures and contractual barriers hospitals may have created. *See, e.g., Johnson v. Misericordia Cmty. Hosp.*, 301 N.W.2d 156, 164–65 (Wis. 1981) (collecting cases and discussing corporate negligence doctrine).

We have considered the corporate negligence doctrine for hospitals before but passed on the invitation to recognize it. *See Strickland v. Madden*, 323 S.C. 63, 71–72, 448 S.E.2d 581, 586 (Ct. App. 1994). There, a patient injured by Dr. Madden's medical negligence sought to hold the hospital liable for negligently failing to revoke Dr. Madden's hospital privileges given nurses' reports that they had twice smelled alcohol on Dr. Madden's breath. *Id.* at 72, 448 S.E.2d at 586. We affirmed the grant of summary judgment to the hospital, declining to recognize the hospital owed a duty based on a corporate negligence theory, reasoning the plaintiff failed to provide a proposed standard of care that had been breached and, further, that no evidence indicated Dr. Madden's patient care had been compromised. *Id.* Likewise, in *Foster v. Greenville County Medical Society*, we refused to hold a medical society that knew of a physician member's probable alcohol abuse owed a duty to warn the doctor's patients. 295 S.C. 190, 193–94, 367 S.E.2d 468, 470 (Ct. App. 1988). We noted the society had no role in determining hospital privileges or disciplining doctors and had no agreement with the hospital to provide information about the society's members or their competence. *Id.* at 194, 367 S.E.2d at 470.

Other courts have rejected attempts to saddle hospitals with a duty to verify its treating physicians are covered by adequate malpractice insurance. In Florida, where by statute doctors are required to be financially able to pay malpractice claims, the supreme court has held hospitals have no affirmative duty to condition the grant of staff privileges on the doctor's proof of compliance with the financial responsibility statute. *Horowitz v. Plantation Gen. Hosp. Ltd. P'ship*, 959 So. 2d 176, 186–87 (Fla. 2007).

We decline to find Hospital owed such a duty under the specific circumstances here. Even if we were inclined to agree with the hospital corporate negligence doctrine, such a declaration of public policy is the function of the legislature or perhaps our supreme court. We therefore affirm summary judgment to Hospital.

**AFFIRMED.**

**LOCKEMY, C.J., and HUFF, J., concur.**