# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Desa Ballard and Desa Ballard P.A., d/b/a Ballard & Watson, Appellants,

v.

Admiral Insurance Company and Adele J. Pope, individually and as Special Administrator of the Estate of Gloria Corley, Respondents.

Appellate Case No. 2019-000367

———————

Appeal From Lexington County
Walton J. McLeod, IV, Circuit Court Judge

———————

Opinion No. 5994
Heard March 15, 2022 – Filed June 28, 2023

———————

## AFFIRMED

———————

Eric Steven Bland, of Bland Richter, LLP, of Lexington; and Scott Michael Mongillo and Ronald L. Richter, Jr., both of Bland Richter, LLP, of Charleston, all for Appellants.

Adele Jeffords Pope, of Law Office of Adele J. Pope, PC, of Newberry, for Respondent Adele J. Pope.

Wesley Brian Sawyer, of Murphy & Grantland, PA, of Columbia, for Respondent Estate of Gloria Corley.

Adam Tremaine Silvernail, of Law Ofc. of Adam T. Silvernail, of Columbia, for Respondent Admiral Insurance Company.

---

**MCDONALD, J.:** In this action for declaratory judgment, Desa Ballard and Desa Ballard, P.A. (collectively, Ballard) appeal an order granting Admiral Insurance Company's (Admiral) motion for judgment on the pleadings, arguing the circuit court erred in considering the language of the "hammer clause"[1] found in Admiral's professional liability insurance policy (the Policy).  Ballard further contends the record lacks the factual development necessary to properly determine whether the refusal to consent to Admiral's proposed settlement was reasonable.  We affirm the well-reasoned order of the circuit court.

**Facts and Procedural History**[2]

In March 2011, Aundra Williams, Gloria Corley's daughter and attorney-in-fact (Daughter), hired Ballard to defend Corley in a lawsuit filed by attorney Adele Pope.  Pope had previously represented Corley in a matter involving Corley's annual distributions from the Martin L. Corley Trust (the Trust).[3]  Although Pope collected approximately $18,333.33 each year from 1999 through 2010 when Corley received her annual distributions from the Trust, she filed suit to recover additional attorney's fees allegedly owed for legal services.  Ballard asserted numerous defenses to Pope's action against Corley, including claims that Pope's fee agreement took advantage of an elderly and frail client and was void as violative of public policy.

While defending Pope's claim, Ballard also represented Corley in negotiating a buy-out of her interests in the Trust. The buy-out included a lump sum payment to

---

[1] A hammer clause "puts pressure on the insured's right to refuse consent to settle and thereby increases an insurer's ability to effectuate a settlement." *Rawan v. Cont'l Cas. Co.*, 136 N.E.3d 327, 330 (Mass. 2019).

[2] We recite the facts here as alleged in Ballard's complaint but recognize Admiral, Pope, and the Estate of Gloria Corley (the Estate) dispute many of these statements.

[3] Corley's late husband established the Trust for her benefit.

Corley but terminated her future annual payments of $55,000 as well as Pope's ongoing yearly attorney's fees of $18,333.33.[4] The Lexington County Probate Court approved the buy-out (the Trust Settlement).

Ballard's complaint in the matter before us alleges the Trust Settlement "was structured so that the lump sum payment to Mrs. Corley was calculated on the basis of monthly payments provided for Mrs. Corley in Mr. Corley's Last Will and Testament for the remainder of Mrs. Corley's life based on statutory life expectancy tables." The Trust Settlement did not include any present or future payments related to Pope's prior legal representation of Corley.

In structuring the Trust Settlement, Ballard met with Daughter and Corley's certified public accountant (CPA) to discuss appropriate steps for preserving the funds for Corley's care and financial needs. Although Ballard alleges reasonable steps were taken to insulate these funds from Pope's fee claim, Ballard advised the CPA that Pope might attempt to recover some portion of the Trust Settlement under a theory consistent with her claim for ongoing yearly attorney's fees.

The Trust—separately represented by its own counsel in conjunction with the Trust Settlement—argued to the probate court that the modification of the distributions to Corley was in the best interest of the Trust. Despite the express language of the Trust Settlement, which sought to nullify Corley's fee agreement with Pope, Pope moved for and obtained an order granting her one-third of the gross amount of the Trust Settlement (the Pope Judgment).[5] The Pope Judgment provided attorney's fees that Pope would not have realized had Corley's interest in the Trust not been liquidated because Corley did not live as long as the statutory life expectancy tables on which the original Trust Settlement was projected.[6] Ballard appealed the Pope Judgment; however, this court dismissed the appeal as untimely.

Ballard timely notified Admiral that Corley could potentially make a claim against her as a result of the untimely appeal of the Pope Judgment. On May 9, 2014,

---

[4] Pope was not a party to the Trust buy-out proceeding.

[5] One of Ballard's filings in a prior matter notes that in August 2013, Pope was awarded "$248,673.87, plus daily interest and costs of collection."

[6] Corley died approximately four years after the execution of the Trust Settlement.

Admiral notified Ballard that it had assigned the defense of any claim to Mendes & Mount, LLP (Mendes).

While not admitting the failure to timely file the appeal caused harm to Corley, Ballard properly notified Daughter of the potential claim against Ballard. Despite advising Daughter to consult with separate counsel given the potential for a conflict, Daughter asked Ballard to continue representing Corley. During this time, Ballard kept Admiral informed of significant developments related to Pope's claim and in August 2014, Admiral accepted notice of the matter as a circumstance that would fall within Ballard's coverage under its 2013–14 Policy. Admiral renewed the Policy each year until 2017–18, when it declined to renew, claiming Ballard had breached the terms and conditions of the Policy by refusing to consent to Admiral's request to engage in settlement discussions with Pope.

Following execution of the Trust Settlement, Ballard suggested Daughter, as attorney-in-fact, obtain counsel for the purpose of establishing a conservatorship and/or guardianship to further protect the Trust Settlement proceeds; Ballard subsequently made an appointment for Daughter with a lawyer for this purpose. Although Ballard believed Daughter met with the recommended lawyer, Daughter cancelled the meeting before it concluded and never returned. In the meantime, Pope continued her efforts to collect the Pope Judgment and amended her complaint for attorney's fees to assert additional claims against third parties.

Ballard began to suspect Daughter had mismanaged or perhaps even misappropriated some or all of the money recovered for Corley through the Trust Settlement. Thus, Ballard advised Daughter she might be a witness in further proceedings relating to Pope's claim and recommended Daughter and Corley obtain separate counsel. Ballard was subsequently relieved as counsel, Corley obtained new counsel, and Daughter obtained separate counsel.

On August 6, 2015, Ballard notified Admiral of a potential new claim, and Admiral engaged Monitor Liability Managers (Monitor) and Mendes to review it.

Corley died on March 31, 2016, and the probate court appointed Pope, a judgment creditor, as special administrator of Corley's estate. Ballard alleges Pope obtained Daughter's consent to serve as special administrator by agreeing the Estate would not attempt to recover any of the funds Daughter mismanaged or misappropriated. Daughter also agreed to assist Pope in pursuing a civil suit against Ballard.

After her appointment as special administrator, Pope asserted Ballard committed legal malpractice by advising Corley to enter into the disadvantageous Trust Settlement. As specified in Corley's estate planning documents, any excess funds recovered in the legal malpractice action that are not paid to Pope will be paid to Daughter as Corley's beneficiary.

In accordance with her rights under the Policy, Ballard notified Admiral of her preference not to extend any settlement offers or enter any settlement in the legal malpractice claim Pope brought in her capacity as special administrator of the Estate. However, Mendes's agents notified Ballard that Admiral wished to engage in pre-suit mediation with Pope in an effort to settle. Ballard repeated that no settlement discussions or mediation were to be initiated by Admiral or any attorney retained to represent Ballard and asserted that doing so would violate Ballard's rights under the Policy. Admiral then notified Ballard that if it could reach a settlement figure and Ballard refused to agree, Admiral would withdraw its defense coverage under the Policy. Ballard "reiterated that no settlement discussions should occur in any context."

In February 2017, Pope filed a legal malpractice claim against Ballard on behalf of the Estate.[7] Admiral again advised Ballard of its plan to initiate settlement discussions. If the negotiations succeeded, Admiral intended to settle the matter and terminate Ballard's coverage. Ballard objected to Admiral's plan to offer in excess of $100,000 to settle, noting such a settlement would convey the impression that the claims were meritorious, reflect negatively on her reputation and standing in the legal community, and harm the firm's future insurability with other professional liability carriers. Ballard further asserted a settlement offer would constitute a breach of Admiral's obligations under the Policy.

Three months after Pope filed the Estate's legal malpractice claim, Monitor notified Ballard that the Policy, as it then existed, would not be renewed due to Ballard's "failure to comply with policy terms and conditions." Upon Ballard's inquiry as to how she failed to comply, Monitor advised Ballard by email that "[t]he basis for

---

[7] The Estate alleged Ballard was negligent in: (1) failing to recognize termination of the trust was not in Corley's best interests; (2) failing to have a guardian ad litem appointed for Corley; (3) representing both Corley and Daughter despite the inherent conflict of interest; (4) failing to recognize Pope's fee agreement entitled Pope to a percentage of the lump sum buyout payment; and (5) undertaking a frivolous defense of the Pope Judgment and then failing to timely appeal.

the non-renewal [was] the insured's refusal to consent to settle."  Ballard challenges this—arguing the Policy does not contain terms requiring her to "consent to settle" upon the carrier's request.  To the contrary, Ballard asserts the Policy provides a  bargained-for contractual right to refuse to settle and Admiral's purported basis for non-renewal was merely anticipatory because the parties had not yet agreed on a settlement figure.  Ballard claims the non-renewal was "invidious, retaliatory and against public policy and constituted a denial of first party insurance coverage."

Ballard subsequently retained counsel and brought this action for declaratory, injunctive, and related relief against Admiral regarding the parties' respective rights and obligations under the Policy.  Admiral answered and counterclaimed, seeking declaratory relief to enforce the Policy as written.  Admiral further sought declarations that: (1) Admiral had the right to participate in settlement negotiations in the underlying legal malpractice action; (2) Ballard owed a duty to cooperate in the defense and settlement of the claim and could not prevent Admiral from participating in settlement negotiations; and (3) the Policy's hammer clause would be enforced as written.

Admiral moved for judgment on the pleadings, and the circuit court held a hearing to address several matters.[8]  Through counsel, Ballard asserted the Policy gave her the right to prevent settlement negotiations if it appeared Pope would benefit from the settlement.

The circuit court granted Admiral's motion for judgment on the pleadings and dismissed Ballard's accompanying bad faith claim without prejudice, finding the Policy section titled "Defense, Cooperation and Settlement" controlling.  Section VI of the Policy provides in pertinent part:

> B. The **Insurer** shall have the sole right and the duty to defend any covered **Claim,** and has the sole right to select defense counsel. . . .
>
> C. Each **Insured** shall cooperate with the **Insurer** in the defense and settlement of any **Claim** . . . . Upon the request of the **Insurer,** the **Insured** shall . . . attend

---

[8] Pope and the Estate filed motions to dismiss or, in the alternative, to strike.  The circuit court granted these motions to dismiss, and Ballard did not appeal the dismissals.

hearings, depositions and trials, assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses . . . and meeting with such representatives for the purposes of investigation or defense, all without charge to the **Insurer.**

Reading these provisions, the circuit court determined that by the plain terms of the Policy, Admiral had the right to control the defense of the case, which included the right to participate in settlement negotiations.

Regarding the hammer clause, the circuit court found the Policy language unambiguous and enforceable according to its plain terms. This clause, found in section VI, paragraph D, provides:

The **Insurer** shall not settle any **Claim** without the **Named Insured's** consent. If, however, the **Named Insured** shall refuse to consent to any settlement recommended by the **Insurer**, which is acceptable to the claimant, and shall elect to contest the **Claim**, or continue any legal, administrative or arbitration proceedings in connection with such **Claim**, then the Insurer's liability for the **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Claims Expense** incurred up to the date of such refusal. Such amounts are subject to the provisions of section V. In the event that the **Named Insured** refuses to consent to any settlement as set forth in section VI. D., the **Insurer's** right and duty to defend such **Claim** shall end upon the date of such refusal.[9]

Although Ballard argued the clause could not be enforced unless the named insured *unreasonably* refuses a settlement proposal recommended by the insurer

[9] Policy section III, paragraph B defines "Claims Expense" as "reasonable and necessary fees, costs and expenses . . . resulting solely from the investigation, adjustment, defense and appeal of a covered or potentially covered **Claim** against the **Insureds**." However, the definition specifically excludes "salaries, wages, overhead or benefit expenses associated with any **Insured**, or any amount covered by the duty to defend obligation of any other insurer." Section V addresses the Policy's limits of liability and deductible.

and acceptable to the claimant, the circuit court declined to insert the word "unreasonably" into the Policy.

Ballard has appealed the circuit court's findings that:

> a. Admiral has the right to negotiate a potential settlement as part of its defense of the Underlying Malpractice Action;

> b. Admiral has a right to participate in settlement negotiations at mediation in the Underlying Malpractice Action;

> c. Plaintiffs owe a duty to cooperate in the defense and settlement of the case and do not have a right to prevent Admiral from participating in settlement negotiations with [the Estate];

> d. If Admiral recommends a settlement to the Named Insured which is acceptable to [the Estate], and the Named Insured rejects the settlement and chooses to contest the Underlying Malpractice Action, then Admiral's liability for the Claim shall not exceed the amount for which the Claim could have been settled, including Claim Expenses incurred up to the date of such refusal; and

> e. If Admiral recommends a settlement to the Named Insured which is acceptable to [the Estate], and the Named Insured rejects the settlement and chooses to contest the Underlying Malpractice Action, then Admiral's right and duty to defend the Underlying Malpractice Action shall end upon the date of such rejection.

## Standard of Review

The circuit court incorporated the provisions of the Policy into its consideration of Admiral's motion for judgment on the pleadings. For that reason, and also because Admiral attached a copy of the Policy to its motion for judgment on the pleadings,

Ballard asserts the proper standard of review is that for a motion for summary judgment; however, Admiral asserts the Policy was part of the pleadings, both through its attachment of the Policy to its answer and counterclaim and due to Ballard's specific references to the Policy throughout her complaint. Thus, Admiral argues and we agree that (1) the circuit court properly considered the Policy when it evaluated Admiral's motion for judgment on the pleadings; and (2) the proper standard of review is that for a motion for judgment on the pleadings.

"Any party may move for a judgment on the pleadings under Rule 12(c), SCRCP. When considering such motion, the court must regard all properly pleaded factual allegations as admitted." *Falk v. Sadler*, 341 S.C. 281, 286, 533 S.E.2d 350, 353 (Ct. App. 2000). In analyzing a Rule 12(c) motion, the court must liberally construe the complaint "so that substantial justice is done between the parties." *Id.* at 287, 533 S.E.2d at 353. Under Rule 12(c),

> If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

In any event, "[w]hether reviewing a grant of summary judgment or a judgment on the pleadings, we apply the same legal standards as the trial court." *Ziegler v. Dorchester Cnty.*, 426 S.C. 615, 619, 828 S.E.2d 218, 220 (2019). "We review questions of law de novo." *Id.*

**Law and Analysis**

## I.    Policy Language

Ballard argues the circuit court's consideration of the hammer clause was premature because "this lawsuit does not seek to prevent a settlement from occurring. Instead, it seeks to prevent Admiral [from] 'pursu[ing] a settlement' or 'seek[ing] to settle' the claim so as to put Ballard in a position of having to invoke the 'consent' provision of the policy." We disagree.

"Insurance policies are subject to the general rules of contract construction." *Auto Owners Ins. Co. v. Benjamin*, 415 S.C. 137, 143, 781 S.E.2d 137, 141 (Ct. App.

2015) (quoting *Whitlock v. Stewart Title Guar. Co.*, 399 S.C. 610, 614, 732 S.E.2d 626, 628 (2012)). "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *Id.* (quoting *Whitlock*, 399 S.C. at 614, 732 S.E.2d at 628). "Courts must enforce, not write, contracts of insurance, and their language must be given its plain, ordinary and popular meaning." *Id.* (quoting *Whitlock*, 399 S.C. at 614, 732 S.E.2d at 628).

"Where the contract's language is clear and unambiguous, the language alone determines the contract's force and effect." *Id.* (quoting *Whitlock*, 399 S.C. at 615, 732 S.E.2d at 628). "Whether the language of a contract is ambiguous is a question of law for the court." *Id.* at 143–44, 781 S.E.2d at 141. "An insurance contract is read as a whole document so that 'one may not, by pointing out a single sentence or clause, create an ambiguity.'" *Id.* at 144, 781 S.E.2d at 141 (quoting *Beaufort Cnty. Sch. Dist. v. United Nat'l Ins. Co.*, 392 S.C. 506, 516, 709 S.E.2d 85, 90 (Ct. App. 2011)). "However, this court must construe '[a]mbiguous or conflicting terms in an insurance policy . . . liberally in favor of the insured and strictly against the insurer.'" *Id.* (quoting *Whitlock*, 399 S.C. at 615, 732 S.E.2d at 628).

Here, section VI, paragraph B of the Policy gives Admiral the "sole right and the duty to defend any covered **Claim**. . . ." Moreover, the clear and unambiguous language of the Policy states Admiral, as the insurer, has the right to control the defense of the case. Likewise, Section VI, paragraph C, provides each "**Insured** shall cooperate with the **Insurer** in the defense and settlement of any **Claim**. . . ."

Section VI, paragraph D, does initially seem to prohibit Admiral from settling any claim without Ballard's consent:

> The **Insurer** shall not settle any **Claim** without the **Named Insured's** consent.

Yet, paragraph D goes on to state:

> If, however, the **Named Insured** shall refuse to consent to any settlement recommended by the **Insurer**, which is acceptable to the claimant, and shall elect to contest the **Claim**, or continue any legal, administrative or arbitration proceedings in connection with such **Claim**, then the Insurer's liability for the **Claim** shall not exceed

the amount for which the **Claim** could have been settled, including **Claims Expense** incurred up to the date of such refusal. . . . In the event that the **Named Insured** refuses to consent to any settlement as set forth in section VI. D., the **Insurer's** right and duty to defend such **Claim** shall end upon the date of such refusal.

Thus, if Admiral recommends a settlement to Ballard that is acceptable to the Estate, Ballard has the right to reject it and continue defending the case. However, such a rejection ends Admiral's duty to defend and caps its liability at the proposed settlement amount. Although the consent clause, found in the same paragraph as the hammer clause, gives Ballard the option to reject a settlement proposed by Admiral, we find nothing in the Policy gives Ballard the ability to prevent Admiral from participating in settlement negotiations. Otherwise, there would be no way to determine an amount "for which the **Claim** could have been settled" for purposes of this provision in the Policy.

Ballard further argues Admiral failed to allege Ballard refused to cooperate in "the handling" of the claim. However, this is exactly what Admiral alleged—Ballard's repeated refusal to allow Admiral to initiate settlement or mediation discussions constituted a failure "to cooperate with the **Insurer** in the defense and settlement of any **Claim**." Ballard further contends Admiral has neither offered nor accepted a settlement. But, in her pleadings, Ballard stated Admiral informed her of its intent to offer the Estate in excess of $100,000. Admiral attempted to initiate settlement discussions both before and after Pope filed suit in 2017; nevertheless, Ballard stated again and again that neither Admiral nor any attorney retained to represent Ballard was to initiate settlement or mediation discussions.

We find the circuit court correctly analyzed the clear and unambiguous language of the Policy in finding Ballard could not prevent Admiral from negotiating with the Estate to settle the Pope claim. The Policy requires Ballard to cooperate with Admiral in the defense and settlement of Pope's action; Ballard is free to choose not to consent to a settlement, but such refusal triggers the consequences of the hammer clause.

## II.   "Reasonableness"

Ballard next argues the record reflects no facts upon which the circuit court could properly determine whether her refusal to permit settlement was reasonable. In so arguing, Ballard attempts to insert a "reasonableness" term into the Policy's

consent to settle clause. Acceptance of this argument would essentially require us to rewrite the Policy, which South Carolina law forbids. *See, e.g.*, *Benjamin*, 415 S.C. at 143, 781 S.E.2d at 141 ("Courts must enforce, not write, contracts of insurance, and their language must be given its plain, ordinary and popular meaning.") (quoting *Whitlock*, 399 S.C. at 614, 732 S.E.2d at 628)).

Ballard cites *Clauson v. New England Insurance Co.*, 254 F.3d 331 (1st Cir. 2001) for the proposition that a hammer clause cannot be enforced unless the insured "unreasonably" rejects a proposed settlement. However, contrary to Ballard's claim, the *Clauson* court merely applied the language of the consent to settle clause in the policy at issue—which included language addressing "unreasonably withheld" consent. *See id.* at 336–35 ("The Company shall have the right to make any investigation it deems necessary and with the written consent of the insured, said consent not to be unreasonably withheld, any settlement of any claim covered by the terms of this policy."). This case is easily distinguishable because Ballard's Admiral Policy contains no such language.

By contrast, courts interpreting polices that—like Ballard's—lack the phrase "unreasonably withheld" in the context of a consent to settle clause have applied the policy language regardless of whether the insured "unreasonably" withheld consent. For example, in *Security National Insurance Co. v. City of Montebello*, Montebello argued "it acted reasonably in refusing a settlement offer conditioned on [an] employee's continuing employment." 680 F. App'x 525, 527 (9th Cir. 2017). Rejecting Montebello's "reasonableness" argument, the Ninth Circuit noted the clause at issue did "not limit the insurer's right to invoke the clause to instances where the insured was unreasonable in rejecting an offer. To hold otherwise would impermissibly rewrite the hammer clause to the policyholder's benefit." *Id.*

Likewise, in *Cowan v. Codelia*, 50 F. App'x 36, 38 (2d Cir. 2002), the Second Circuit explained, "[T]he district court conducted an evidentiary hearing regarding the parties' settlement discussions and found that Codelia's 'phantom objections' and 'illusory' complaints about the settlement were the equivalent of a rejection." Thus, the court rejected the insured's argument "that its right to choose its own counsel supplanted the effect of the consent-to-settle clause, particularly where Chicago Insurance pursued a settlement in good faith."[10] *Id.*

---

[10] Ballard argues there is no need for an "unreasonably withheld" qualifier for the Policy's consent consideration because the requirement of good faith and fair dealing on the part of the insurer supplants the need for such Policy language. We disagree. While Ballard correctly argues courts must balance a malpractice

We find the circuit court correctly applied the reasoning of *City of Montebello* in rejecting Ballard's argument seeking to rewrite the clear and unambiguous language of the Policy. The Policy's hammer clause sets out the consequences of an insured's rejection of a recommended settlement such as that proposed by Admiral here. Because the clause does not include a "reasonableness" modifier, development of the factual record in this case was unnecessary; the circuit court properly considered the Policy language as written.

**Conclusion**

For the foregoing reasons, the circuit court's order granting Admiral's motion for judgment on the pleadings is

**AFFIRMED.**

**THOMAS and HEWITT, JJ., concur.**

---

carrier's interest in efficiently resolving claims against its insured's right to protect her reputation and challenge claims reasonably believed to be of little or no merit, this is not such a bad faith action. Because the circumstances alleged in Ballard's Complaint do not implicate such balancing concerns, we focus—as we must—on the plain language of the Policy. *Cf. Sentry Select Ins. Co. v. Maybank L. Firm, LLC*, 426 S.C. 154, 157–58, 826 S.E.2d 270, 271–72 (2019) (noting an "insurer's right to settle must be exercised in good faith, and that duty of good faith requires the insurer to act reasonably in protecting the insured from liability in excess of the policy limits").