**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

SLF III - Hardeeville, LLC, Respondent,

v.

RSV - Hardeeville, LLC, Appellant.

Appellate Case No. 2023-000277

———————

Appeal From Jasper County
Carmen T. Mullen, Circuit Court Judge

———————

Unpublished Opinion No. 2025-UP-263
Heard December 3, 2024 – Filed July 23, 2025

———————

**REVERSED AND REMANDED**

———————

Keating L. Simons, III, of Simons & Dean, of Charleston, for Appellant.

J. David Black, of Maynard Nexsen, PC, of Columbia; Cheryl D. Shoun, of Maynard Nexsen, PC, of Charleston; and Scott Franklin Talley, of Talley Law Firm, P.A., of Spartanburg, all for Respondent.

———————

**PER CURIAM:** RSV – Hardeeville, LLC (RSV) appeals the circuit court's order denying its motion for summary judgment, granting summary judgment in favor of SLF III – Hardeeville, LLC (SLF), and finding that the assignments by which RSV

obtained its development rights in the property prohibited the conversion of more than 155 acres from residential to light industrial use. On appeal, RSV argues the circuit court erred by (1) ignoring language in the Reed-HTI Assignment showing that conversion rights were intended to be included; (2) construing the Reed-HTI Assignment to prohibit the conversion of property from residential to light industrial use without an explicit prohibition on doing so; (3) concluding that the language in the Reed-HTI Assignment created a restrictive covenant; (4) failing to strictly construe the Reed-HTI Assignment and resolve doubts and ambiguities therein in favor of RSV's free use of the property; (5) construing the Reed-HTI Assignment in a manner contrary to the public policy of the City of Hardeeville (City); (6) holding that RSV may only develop for light industrial use the 155 acres referenced in the SLF/Reed-HTI Assignment; (7) granting declaratory relief without the City being a party; and (8) failing to consider affidavits and exhibits. We reverse and remand.

RSV is the owner of approximately 800 acres of land in Hardeeville, known as the "Savannah Tract," which is, in turn, part of a larger parcel known as the "Hardeeville Tract." The Savannah Tract is zoned as a Planned Development District (PDD) pursuant to a Development Agreement (DA) entered into by the City and the previous Hardeeville Tract landowner, Copper Station Holdings, LLC (Copper Station). The DA and its exhibits, including the PDD, control the development and permitted uses of the Savannah Tract. The DA provides for mixed use, residential, and commercial development, with 1,026 acres designated for light industrial use. However, both the DA and the PDD grant "[t]he Owner and Developer . . . the right to convert residential acreage to any commercial or light industrial acreage" without a cap.

In May 2006, Reed-HTI acquired 1,163.89 acres of the Hardeeville Tract from Copper Station and JPR Land Co., LLC (JPR) acquired the remaining 5,284.38 acres. As part of the land transactions, Copper Station assigned all of its development rights to JPR. Reed-HTI then obtained its development rights pursuant to assignments from JPR and SLF: the Reed-HTI Assignment (Reed-HTI Assignment) and the SLF/Reed-HTI Assignment (SLF Assignment). It seems the parties do not dispute that, at some point, RSV acquired whatever rights were conveyed to Reed-HTI by the Reed-HTI and SLF Assignments.

Pursuant to the Reed-HTI Assignment, JPR assigned rights to Reed-HTI to develop 2,262 residential dwelling units and 75 acres of land for general commercial use. It purported to reserve any development rights not expressly set forth therein for SLF, provided that any restrictions would run with the land and be

enforceable against a successor in interest, and made SLF a third-party beneficiary to the assignment.

The relevant portions of Item 1 of the Reed-HTI Assignment are as follows:

(a) Assignor does hereby transfer, assign, convey and deliver unto Assignee, its successors and assigns, Assignor's rights, privileges and obligations under the [DA] to develop (i) up to 2,262 Residential Dwelling Units (as such term is currently defined in the [DA] and the PDD), and (ii) up to 75 upland acres of General Commercial (including all Permitted Uses set forth under the General Commercial designation) as currently defined in the PDD, except for the Excluded Obligations identified below. Accordingly, Assignee may (i) develop and use up to 75 upland acres of the Property for any and all "Permitted Uses" set forth under the "General Commercial" designation as currently defined in the PDD, and (ii) develop and use the balance of the Property only for (A) up to 2,261 Residential Dwelling Units (in the aggregate) of Single-Family Residential, Multi-Family Residential (but only for multi-family units with an average sales price in excess of $180,000 per unit), and Model Homes/Sales Center, (B) Community Recreation, (C) Institutional/Civic, (D) Maintenance Areas, (E) Open Space, (F) Roads, (G) Setback and Buffers, (H) Signage Control, (I) Silviculture, (J) Wetlands, (K) Utilities, and (L) Recreational Vehicle Parks, as all the foregoing use categories are currently defined in the PDD, and for no other use or purpose. The foregoing rights hereby assigned by Assignor to Assignee shall be subject to the terms, obligations and conditions of and under the PDD and the [DA]. Other than those rights assigned hereby as specifically set forth above, the Assignor shall not be required to assign or transfer to Assignee, and Assignee shall not be entitled to, any other development rights under the [DA] or the PDD, all of which are retained by Assignor to be assigned to [SLF].

(b) Assignee hereby covenants and agrees not to develop or use the Property (i) in a manner inconsistent with the foregoing development rights assigned . . . pursuant to Paragraph 1(a) above, or (ii) for any use not specifically listed in Paragraph 1(a) above, and that such restriction shall be a covenant and restriction running with the Property and shall be binding upon and enforceable against Assignee, its successors and assigns, and any subsequent owner(s) of the Property (or any portion thereof), and shall inure to the benefit of and be enforceable by

Assignor and SLF and their respective representatives, successors and assigns (and by any subsequent owner of all or any portion of the property subject to the PDD owned or to be owned by SLF). . . .

(c) Notwithstanding anything herein to the contrary, Assignee shall not convert (and shall have no right to convert) any of the 75 upland acres designated for General Commercial to use for Residential Dwelling Units or for the purpose of increasing the number of Residential Dwelling Units. . . .

(f) Assignee hereby assumes and agrees to perform all of Assignee's rights, privileges and obligations as described in the [DA], applicable to the Property, except for the Excluded Obligations. Assignee acknowledges receipt of the [DA] and all Exhibits thereto and agrees to be bound by the terms thereof and to develop the Property in accordance with such terms and the development rights assigned hereby. The rights and obligations hereby assigned and assumed shall be covenants running with the land, binding upon the parties hereto and their successors and assigns.

(g) SLF is hereby deemed a third-party beneficiary of this Partial Assignment and Assumption with respect to the rights and remedies of SLF as provided herein. . . .

Item 3 states:

For purposes of illustration only, and not as a limitation on the assignment and assumption effectuated by Paragraph 1 above, Assignor hereby assigns and Assignee hereby assumes and agrees to perform and be bound by the following:

(a) Assignor does hereby assign and transfer to Assignee all of Assignor's rights, title and interest under the [DA] to develop up to 2,262 Residential Dwelling Units (as such term is currently defined in the [DA] and the PDD) and up to 75 upland acres of General Commercial (as such term is currently defined in the PDD). . . .

Finally, Item 10 states that "[a]ll other terms, conditions, rights and privileges contained in the [DA] and not specifically referenced herein shall remain in full force and effect and binding upon the parties hereto and their successors and assigns."

In May 2019, RSV submitted a master plan for the Savannah Tract to the City for approval, in which RSV sought to develop over 577 acres for light industrial use.[1] The City approved the plan in July 2019.  SLF then filed a complaint in October 2020 seeking a declaratory judgment that RSV was prohibited from developing more than 155 acres of the Savannah Tract for light industrial use.  In December 2021, RSV filed a motion for summary judgment, and SLF renewed its previously filed summary judgment motion.  The circuit court denied RSV's motion and granted summary judgment in favor of SLF.  RSV filed a motion to reconsider, which the circuit court also denied.

**ISSUES ON APPEAL**[2]

1. Did the circuit court err by ignoring language in the Reed-HTI Assignment showing that conversion rights were intended to be included, instead construing it to prohibit the conversion of property from residential to light industrial use, such that RSV may only develop for light industrial use the 155 acres referenced in the SLF Assignment?

2. Did the circuit court err by concluding that language in the Reed-HTI Assignment was sufficient to prove a restrictive covenant?

3. Did the circuit court err by failing to construe the Reed-HTI Assignment in favor of RSV's free use of the property and in a manner contrary to the public policy of the City of Hardeeville?

4. Did the circuit court err by granting declaratory relief in the absence of the City of Hardeeville as a party?

5. Did the circuit court err by failing to consider affidavits and exhibits?

---

[1] Pursuant to Item 1(b) of the SLF Assignment, Reed-HTI received "SLF's rights, privileges, and obligations under the [DA] to develop, on the Reed-HTI Property, up to one hundred fifty-five (155) acres of [l]ight [i]ndustrial use, as currently defined in the PDD."  Although not expressly stated in the master plan, the parties agree that RSV intended to convert acreage from residential to light industrial use pursuant to the Reed-HTI Assignment to supplement the 155 light industrial acres assigned via the SLF Assignment.

[2] Because some of the issues are interconnected and rely on the same law and/or facts, we have combined them for purposes of our analysis.

**STANDARD OF REVIEW**

"In reviewing a grant of summary judgment, [an] appellate court applies the same standard as the [circuit] court under Rule 56(c), SCRCP." *Woodson v. DLI Props., LLC*, 406 S.C. 517, 528, 753 S.E.2d 428, 434 (2014). "A [circuit] court may properly grant a motion for summary judgment when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Buonaiuto v. Town of Hilton Head Island*, 440 S.C. 144, 150, 889 S.E.2d 625, 628 (Ct. App. 2023) (quoting Rule 56(c), SCRCP). "Questions of law may be decided with no particular deference to the [circuit] court." *S.C. Dep't of Transp. v. M & T Enters. of Mt. Pleasant, LLC*, 379 S.C. 645, 654, 667 S.E.2d 7, 12 (Ct. App. 2008).

**INTERPRETATION OF THE REED-HTI ASSIGNMENT**

RSV argues the plain language of the Reed-HTI Assignment shows that the parties intended for conversion rights to be included. Specifically, it points to Item 3(a), which states that "all" of JPR's rights under the DA in the 2,262 residential units were assigned and transferred, and Item 10, which states that "[a]ll other terms, conditions, rights and privileges contained in the [DA] not specifically referenced [in the assignment] shall remain in full force and effect." It further notes the Reed-HTI Assignment included an express prohibition on the conversion of property from general commercial to residential use but is silent regarding conversions from residential to light industrial use. RSV asserts that these provisions express an intent to assign conversion rights, or in the alternative, create an ambiguity that makes summary judgment improper. We agree with RSV's latter contention and find the Reed-HTI Assignment is ambiguous.

"The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *Beaufort Cnty. Sch. Dist. v. United Nat. Ins. Co.*, 392 S.C. 506, 516, 709 S.E.2d 85, 90 (Ct. App. 2011). "The parties' intention must be gathered from the contents of the entire agreement and not from any particular clause thereof." *Ecclesiastes Prod. Ministries v. Outparcel Assocs., LLC*, 374 S.C. 483, 498, 649 S.E.2d 494, 502 (Ct. App. 2007). "A contract is ambiguous when the terms of the contract are reasonably susceptible of more than one interpretation." *S.C. Dep't of Nat. Res. v. Town of McClellanville*, 345 S.C. 617, 623, 550 S.E.2d 299, 302 (2001). "[S]ummary judgment is improper where the motion presents a question as to the construction of a written contract, and the contract is ambiguous because the intent of the parties cannot be gathered from the four corners of the instrument." *HK New Plan Exch.*

*Prop. Owner I, LLC v. Coker*, 375 S.C. 18, 23, 649 S.E.2d 181, 184 (Ct. App. 2007). "Whether an ambiguity exists in the language of a contract is . . . a question of law." *Laser Supply & Servs., Inc. v. Orchard Park Assocs.*, 382 S.C. 326, 344, 676 S.E.2d 139, 144 (Ct. App. 2009).

We note that the parties filed cross-motions for summary judgment and neither party contended to the circuit court that the contract was ambiguous. However, the parties "presented opposing arguments before the [circuit] court and this [c]ourt on the interpretation of the contract." *Wallace v. Day*, 390 S.C. 69, 75, 700 S.E.2d 446, 449 (Ct. App. 2010). "The issue of a contract's interpretation necessarily subsumes the primary question of whether the contract's language is clear or ambiguous," and it is a question of law for this court to determine whether the Reed-HTI Assignment is ambiguous. *Id.* "Therefore, we have not only the authority but also the responsibility to recognize an ambiguity in a contract when determining whether the [circuit] court appropriately relied on the contract's language in granting summary judgment." *Id.* at 75, 700 S.E.2d at 450.

Here, Item 1(a) of the Reed-HTI Assignment states that JPR transferred and assigned its "rights, privileges and obligations under the [DA] to . . . *develop and use the balance of the Property only for* (A) up to 2,261 Residential Dwelling Units . . . and Model Homes/Sales Center, (B) Community Recreation, (C) Institutional/Civic, (D) Maintenance Areas, (E) Open Space, (F) Roads, (G) Setback and Buffers, (H) Signage Control, (I) Silviculture, (J) Wetlands, (K) Utilities, and (L) Recreational Vehicle Parks, as all the foregoing use categories are currently defined in the PDD, *and for no other use or purpose*," and that Reed/RSV "shall not be entitled to, any other development rights under the [DA] or the PDD, all of which are retained by Assignor to be assigned to [SLF]." Further, Item 1(b) states that Reed/RSV "covenants and agrees not to develop or use the Property (i) in a manner inconsistent with the foregoing development rights assigned by Assignor to Assignee pursuant to Paragraph 1(a) above, or (ii) for any use not specifically listed in Paragraph 1(a)."

We acknowledge that these provisions seem to demonstrate an intent to restrict the range of uses for the property, and the circuit court found the Reed-HTI Assignment to be unambiguous based largely on the force of these provisions. However, the circuit court's order does not analyze, or even mention, other provisions in the Reed-HTI Assignment that seem to show an intent to convey *all* of JPR's rights, which would include conversion rights. Rather, the order's analysis focuses on two sentences from Item 1(a), without considering the broader context of the contract as a whole; this was error. *See Ecclesiastes Prod. Ministries*, 374

S.C. at 498, 649 S.E.2d at 502 ("The parties' intention must be gathered from the contents of the entire agreement and not from any particular clause thereof.").

For example, Item 1(a) also states that all of "[t]he foregoing rights hereby assigned . . . shall be subject to the terms, obligations and conditions of and under the PDD and the [DA]." The DA and PDD provide that a developer "shall . . . have the right to convert residential acreage to any commercial and/or light industrial acreage" without a cap. Additionally, Item 1(f) states that Reed/RSV "assumes and agrees to perform *all* of [JPR's] rights, privileges and obligations as described in the [DA], applicable to the Property, except for Excluded Obligations."[3] Item 3 provides that JPR assigned and transferred "*all* of [its] rights, title and interest under the [DA] to develop up to 2,262 Residential Dwelling Units." Finally, Item 10 states that "[a]ll other terms, conditions, rights and privileges contained in the [DA] and *not specifically referenced herein* shall remain in full force and effect and binding upon the parties hereto and their successors and assigns."

Other provisions further muddy the waters. For example, the Reed-HTI Assignment also contains an explicit restriction on conversion rights for the 75 acres designated for general commercial use, but does not contain such a provision for the residential acreage. *See Ellie, Inc. v. Miccichi*, 358 S.C. 78, 94, 594 S.E.2d 485, 494 (Ct. App. 2004) ("Parties are governed by their outward expressions and the court is not at liberty to consider their secret intentions."). Additionally, it repeatedly refers to "Residential Dwelling Units (as such term is currently defined in the [DA] and the PDD)." However, the DA and PDD do not define "Residential Dwelling Units" or "residential acreage," and thus it is unclear what implications those terms carry in the context of conversion rights or how they relate to each other, particularly since the DA and PDD specifically allow for the free conversion of *residential acreage* to light industrial use.

Accordingly, we hold the Reed-HTI Assignment is ambiguous because it is reasonably susceptible to more than one interpretation as to whether it conveyed all of JPR's development rights, including conversion rights, or whether it restricted development of the residential acreage only to the uses and purposes set forth in Item 1(a). *See McClellanville*, 345 S.C. at 623, 550 S.E.2d at 302 ("A contract is ambiguous when the terms of the contract are reasonably susceptible of more than

---

[3] "Excluded Obligations" are defined in Item 2, and conversion rights are not listed among the excluded obligations.

one interpretation."); *Ecclesiastes Prod. Ministries*, 374 S.C. at 498, 649 S.E.2d at 502 ("The parties' intention must be gathered from the contents of the entire agreement and not from any particular clause thereof."). Therefore, we reverse the circuit court's grant of summary judgment and remand for trial because "the determination of the parties' intent at the time they executed the contract is a question of fact that should not have been decided on summary judgment."[4] *See Wallace*, 390 S.C. at 76, 700 S.E.2d at 450 (reversing the grant of summary judgment when the parties offered competing interpretations of a lease, even though neither party asserted the lease was ambiguous).[5]

**REVERSED AND REMANDED.**

**WILLIAMS, C.J., and MCDONALD and TURNER, JJ., concur.**

---

[4] This holding is dispositive of the remaining issues on appeal. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (explaining an appellate court need not address remaining issues when its resolution of a prior issue is dispositive).

[5] To the extent either party contends this court should look to the SLF Assignment or other documents not specifically referenced in the Reed-HTI Assignment to aid in its interpretation, we find our analysis must be confined to the four corners of the contract at issue, and thus, we have concentrated solely on the Reed-HTI Assignment. *See Silver v. Aabstract Pools & Spas, Inc.*, 376 S.C. 585, 591, 658 S.E.2d 539, 542 (Ct. App. 2008) ("In construing and determining the effect of a written contract, the intention of the parties and the meaning are gathered primarily from the contents of the writing itself, or, as otherwise stated, from the four corners of the instrument . . . ." (quoting *McPherson v. J.E. Sirrine & Co.*, 206 S.C. 183, 204, 33 S.E.2d 501, 509 (1945))).